**Roy Allen HARICH,
Petitioner-Appellant,**

v.

**Richard DUGGER, Secretary, Florida Department of Corrections,
Respondent-Appellee.**

No. 86–3167.

United States Court of Appeals,
Eleventh Circuit.

April 21, 1988.

Trial Transcript at 1344–44 (There are two consecutive pages in the trial transcript numbered as 1344.).

Jonathan F. Horn, CBS, Inc., New York City, Michael A. Mello, Vermont School of Law, South Royalton, Vt., for petitioner-appellant.

Margene A. Roper, Asst. Atty. Gen., Daytona Beach, Fla., for respondent-appellee.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, and EDMONDSON, Circuit Judges.

FAY, Circuit Judge:

Roy Allen Harich appeals from a final judgment of the district court denying his petition for a writ of habeas corpus. Harich alleges (1) that he is entitled to an evidentiary hearing to show that trial counsel was ineffective because counsel failed to adequately investigate and present a voluntary intoxication defense, and (2) that the prosecutor and the trial court misled the jurors as to their role in the sentencing procedure in violation of *Caldwell v. Mis-*

*sissippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We affirm.

## I. BACKGROUND

The panel opinion thoroughly explains the facts and procedural background of this case. *Harich v. Wainwright,* 813 F.2d 1082, 1084–87 (11th Cir.1987). To aid in understanding this case, we briefly recount its background.

Roy Harich testified that on June 26, 1981 between 4:00 p.m. and 9:00 p.m. he consumed about fifteen cans of beer and six marijuana cigarettes and became "mildly drunk." Trial Transcript, Vol. II, at 502–08. On his way home from a friend's house he met Carlene Kelley and Deborah Miller at a gas station in Daytona Beach. The two girls did not know Harich, but after some discussion they accepted a ride with him. While in Harich's van, the three smoked a small amount of marijuana.

They stopped at a convenience store to purchase a six-pack of beer. Harich then drove the girls to the woods where he had a marijuana patch. The marijuana leaves were too damp to smoke, so they placed the leaves under the hood of the van to dry. After waiting for about an hour, petitioner began to discuss the sexual problems he had been having with his wife. At this point, Miller asked if they could leave. They got into the van, but petitioner drove only a few yards before stopping. Using a gun, petitioner forced Carlene Kelley to have sex with him. He then offered to give them a ride back, promising not to hurt them. The girls accepted.

After a short drive, petitioner told the two girls that they would have to get out and walk the rest of the way. He instructed them to lie down behind the van while he drove away. The two then laid down on their stomachs behind the van. Harich wrapped his gun in a towel and shot both Kelley and Miller in the back of the head. Petitioner then used a knife to cut both their throats. Kelley died instantly, but Miller survived. Harich drove away.

Miraculously, Miller remained conscious and made her way to the highway. A passing motorist picked her up and drove her to a hospital. At the hospital, Miller described her assailant and his van. She told the police that her attacker's name was Roy. Trial Transcript, Vol. I, at 228. At trial, she made an in-court identification of the petitioner.

Harich was the only witness for the defense. He claimed that the alcohol and drugs he consumed the night of the murder caused him to forget the events in detail until December, 1981. Harich testified that when his memory became clear he remembered driving Kelley and Miller into the woods to look for marijuana. However, he denied sexually assaulting, attempting to kill, or killing anyone. He claimed that he left the girls, unharmed, at a nearby convenience store at approximately 11:00 p.m., and arrived home at 11:10 p.m. This was about fifty minutes before the police learned of the incident.

The State of Florida charged Harich with first degree murder, use of a firearm in the commission of a felony, and two counts of kidnapping. The jury found defendant guilty of all charges, and then advised the trial court to impose the death penalty. The trial court sentenced Harich to death for the murder.

After exhausting all available remedies in the state courts,[1] Harich filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Florida. The district court dismissed the petition and denied petitioner's request for an evidentiary hearing. The district court also denied petitioner's request for a certificate of probable cause to appeal. Harich immediately appealed. This Court granted his request for a certificate of probable cause and entered an order staying his execution pending this appeal.

## II. DISCUSSION

 Having made a thorough examination of this case, we adopt sections IB,

---

**1.** For a more detailed account of the procedural history in this case, *see Harich,* 813 F.2d at 1084–85.

II, III, IV, VI, and VII of Judge Clark's panel opinion. *See Harich v. Wainwright,* 813 F.2d 1082 (11th Cir.1987).[2] This opinion discusses ineffectiveness of counsel and the *Caldwell* issue.

### A. Ineffectiveness of Counsel

Petitioner requests an evidentiary hearing to show that trial counsel was ineffective because he was unaware that under Florida law voluntary intoxication is a defense to premeditated murder. Harich claims that as a result of this alleged ignorance, counsel: (1) failed to seek a jury instruction on voluntary intoxication;[3] (2) failed to object when the prosecutor misstated the Florida law regarding intoxication; and (3) failed to seek an expert opinion on the impact of Harich's intoxication on his ability to premeditate. Neither the state courts nor the district court held an evidentiary hearing in this case. Petitioner is entitled to an evidentiary hearing if his allegations, taken as true, might merit relief. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Code v. Montgomery,* 725 F.2d 1316, 1321–22 (11th Cir.1984).

The sixth amendment right to an attorney requires "reasonably effective assistance" of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland v. Washington* sets forth the standard for evaluating ineffective assistance of counsel claims. First, the defendant must show that "in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066. In practice this means that courts will not find that an attorney is incompetent for using a particular approach to a case so long as that approach was reasonable. There is a strong presumption that counsel provided effective assistance. *Id.* at 689–90, 104 S.Ct. at 2065–66. Second, "[t]he defendant must show that there is a reasonable probability that, but for coun-

---

**2.** Brackets enclosing material are used, unless otherwise indicated, to denote insertions or additions taken directly from the panel opinion prepared by Judge Clark.

**3.** [As the Florida Supreme Court noted in denying Harich's habeas corpus petition, 484 So.2d 1237, 1238 n.*, the pre-April 1981 version of the Florida Standard Jury Instructions in Criminal Cases contained an affirmative defense instruction for intoxication. Instruction 2.11(c) read as follows:

*When a Defense*

Voluntary drunkenness or intoxication (impairment of the mental faculties by the use of narcotics or other drugs) does not excuse nor justify the commission of crime, but intoxication (impairment of the mental faculties by the use of narcotics or other drugs) may exist to such an extent that an individual is incapable of forming an intent to commit a crime, thereby rendering such person incapable of committing a crime of which a specific intent is an essential element. When the evidence tends to establish intoxication (impairment of the mental faculties by the use of narcotics or other drugs) to this degree, the burden is upon the state to establish beyond a reasonable doubt that the defendant did, in fact, have sufficient use of his normal faculties to be able to form and entertain the intent which is an essential element of the crime.

*When Not a Defense*

Drunkenness (impairment of the mental faculties by the use of narcotics or other drugs) which does not go to the extent of making a person incapable of forming the intent, which is an essential element of a crime, does not in any degree reduce the gravity of the offense. Drunkenness (impairment of the mental faculties by the use of narcotics of [sic] other drugs) arising after the formation of the intent which is an essential element of a crime and voluntarily induced for the purpose of nerving the offender to commit a crime already planned does not excuse nor reduce the degree of the crime.

*Partial Intoxication*

Partial intoxication (impairment of the mental faculties by the use of narcotics or other drugs) which merely arouse the passions or reduces the power of conscience neither mitigates nor lessens the degree of guilt if the offender still knew right from wrong, the probable consequences of his act, and was capable of forming a specific intent to commit the crime.

For some reason, this instruction did not survive the 1981 amendments to the standard instructions, although the other affirmative defense instructions (alibi, insanity, entrapment, and self-defense) were carried forward. Notwithstanding the exclusion of the intoxication instruction in the 1981 amendment, intoxication remains a defense to specific intent crimes in Florida. *See Gardner v. State,* 480 So.2d 91 (Fla.1985); *Linehan v. State,* 476 So.2d 1262 (Fla.1985).] 813 F.2d at 1088 n. 4.

sel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. at 2069.

### 1. *The Range of Professionally Competent Assistance.*

The district court, without holding an evidentiary hearing, found that counsel made a tactical decision not to pursue the intoxication defense.[4] *See* Record, Tab 12, at 3. According to the record before us, however, no court has heard testimony from trial counsel regarding his decisions in pursuing Harich's defense. Without a hearing, it is impossible to determine whether counsel's failure to argue the intoxication defense was an actual trial tactic. To determine whether counsel was ineffective, we must first consider whether competent counsel could have reasonably decided not to pursue the voluntary intoxication defense.

Throughout the guilt/innocence phase of the trial, Harich maintained that he was innocent. He testified that due to the quantity of alcohol and drugs he consumed the night of the murder, he was unable to recall the events in detail. After reading the morning newspaper, he feared that he might be a suspect. Harich then contacted a local defense attorney and the two of them agreed that Harich would go to the police to explain his innocent role in the incident. The police, however, arrested Harich before he contacted them. Harich testified that his memory returned five months later. At that point he admitted driving the victims to the woods to look for marijuana and then dropping them off at a convenience store, unharmed.

Defense counsel faced a difficult dilemma. Harich admitted that he was with the

victims that evening, yet insisted that he was innocent of any wrongdoing. He also indicated that he was under the influence of the drugs and alcohol that evening. Armed with these tough facts, defense counsel adopted the primary defensive strategy of asserting factual innocence.

■■■ Petitioner suggests that defense counsel should have employed alternative defenses. We believe that it was reasonable not to pursue alternative defenses beyond the length taken by counsel.[5] Harich testified that he was only "mildly drunk" and did not commit these crimes.

> To suggest to the jury that Harich was so drunk that he could not have "intended" the consequences of these acts proved by strong evidence would have been totally contrary to and undermining of the position being taken by Harich himself. Although inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury.
>
> By handling the matter the way he did, defense counsel was able to inject the thought of diminished capacity (due to heavy drinking and marijuana) without totally rejecting the testimony of Harich.

*Harich,* 813 F.2d at 1105 (Fay, J., dissenting in part, concurring in part).

It is not enough for petitioner to claim that his lawyer was ignorant of the Florida law. Petitioner must prove that the approach taken by defense counsel would not have been used by professionally competent counsel. As the Supreme Court has stated, petitioner "must overcome the strong presumption that counsel provided effective assistance.... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a par-

---

**4.** Under the umbrella term "pursuing an intoxication defense" we include all three of petitioner's allegations relating to ineffectiveness of counsel: (1) failure to seek a jury instruction on voluntary intoxication; (2) failure to object when the prosecutor misstated the Florida law regarding intoxication; and (3) failure to seek

an expert opinion on the impact of intoxication on Harich's ability to premeditate.

**5.** The record shows that defense counsel made many calculated attempts to uphold petitioner's position of factual innocence while injecting evidence of intoxication.

ticular client in the same way." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Considering that defendant denied committing the crimes, and testified as to his factual innocence, we conclude that the approach taken and the presentation made by defense counsel was one which falls well within the objective yardstick that we apply when considering the question of ineffectiveness of counsel.[6] We cannot say that by failing to pursue an intoxication defense, counsel's approach to this case was outside the range of professionally competent assistance. A competent attorney completely informed on the intoxication defense and faced with a defendant advocating his factual innocence could well have taken action identical to counsel in this case.

### 2. *The Probability of Change in the Outcome.*

■■■■■■ Even if we found that competent counsel would not have taken the approach defense counsel used in this case, we would affirm. We do not believe that petitioner satisfied the second prong of *Strickland* by showing any prejudice from counsel's alleged errors.[7] Petitioner failed to demonstrate that there is a reasonable probability that including defense counsel's omissions would have changed the outcome of the case. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Under Florida law, voluntary intoxication is a defense to first degree murder when the intoxicant renders the defendant incapable of forming the intent to commit the crime. *See supra* note 3. Even deciding every credibility determination in Harich's favor, we find that it is not reasonably probable that the jury would have accepted the intoxication defense. Harich's lawyer built a case around his client's claim of factual innocence. Through his own testi-

mony, Harich recounted details about what he did, where he went, and when he dropped off the girls. Harich tried to convince the jury that he was not with Kelley and Miller when these crimes were committed. The jury did not believe him.

The evidence favoring conviction was the persuasive testimony of the survivor, Deborah Miller, identifying Harich as the assailant and stating that Harich appeared sober on the day of the crimes. In addition, evidence admitted at trial revealed that Harich operated his vehicle without any noticeable impairment. He also tricked the girls into lying down behind his van and shot them in the head with a gun he had the presence of mind to muffle. Finally, after shooting the victims, Harich sliced their throats to insure their death.

Petitioner claims that had counsel included a jury instruction on voluntary intoxication, there is a reasonable probability that the jury would have found him not guilty by reason of intoxication. We find this difficult to believe. The acts committed required a significant degree of physical and intellectual skills. *See Keys v. Duckworth*, 761 F.2d 390, 393 (7th Cir. 1985) (per curiam). Moreover, to accept the intoxication argument, the jury would have had to disbelieve the testimony of both Miller and Harich.[8] The absence of a jury charge did not prejudice petitioner.

■■■■ We also feel that there was not a reasonable probability of a different result had defense counsel objected to the prosecutor's misstatement of the applicable law during closing arguments. Essentially, the prosecutor indicated that because Harich's state of intoxication was voluntary, Florida law did not permit mitigation of first degree murder. Although the prosecutor incorrectly stated the law, *see supra* note 3, there was no prejudice. Defense counsel

---

**6.** Indeed, we think that the lawyer was above average if not outstanding in representing his client in this case.

**7.** It is not error to decline to hold an evidentiary hearing on a habeas corpus petition alleging ineffective assistance of counsel where the allegations fail to satisfy the "prejudice" requirement necessary under *Strickland v. Washington*.

*Hill v. Lockhart*, 474 U.S. 52, 60, 106 S.Ct. 366, 371, 88 L.Ed.2d 203 (1985).

**8.** The jury would have had to find that Harich lied about his innocence while telling the truth about his state of intoxication. It is not reasonably probable that the jury would have made such a finding.

subsequently stated in his closing argument that the jury *should* consider Harich's alleged state of intoxication as mitigating evidence. The jury thus heard both positions on this issue. Because the trial judge correctly instructed the jury that closing arguments were not treated as evidence, there was even less chance of prejudice. An objection by defense counsel to the prosecutor's misstatement was unlikely to change the result for the petitioner.

■ It is also unlikely that presenting expert testimony on intoxication in the guilt/innocence phase of the proceedings would have impacted on the jury's determination of guilt. Telling the jury that Harich was not capable of forming the specific intent to kill, kidnap, or sexually assault the victims because he was suffering from alcohol idiosyncratic intoxication, would implicate him in the murder in contradiction of his own testimony. Defense counsel did use an expert during the penalty phase with apparently no impact on the jury's recommended sentence.[9] It is, therefore, not reasonably probable that presenting expert testimony earlier would have resulted in a different verdict.

We find that given the state of Florida law at the time of trial, even counsel who knew and appreciated the relevance of intoxication could have reasonably decided not to pursue such a defense in this case. We also find that petitioner did not suffer any prejudice thereby, as it is not reasonably probable that the jury would have accepted the intoxication defense petitioner suggests defense counsel should have offered. We do not believe that petitioner raised a colorable claim of ineffectiveness under *Strickland.* After a thorough review of the record, we hold that under the

facts of this case, these allegations, if true, do not constitute ineffective assistance of counsel. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Code v. Montgomery,* 725 F.2d 1316, 1321 (11th Cir.1984). Petitioner, therefore, is not entitled to an evidentiary hearing on this claim.

### B. The *Caldwell* Issue

Petitioner contends that statements made by the prosecutor and by the trial court misled the advisory jury as to its critical role in the sentencing process in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).[10]

In *Caldwell* the prosecutor urged the jury not to view itself as determining whether defendant would die, because the Supreme Court of Mississippi automatically reviewed a death sentence for correctness. The Supreme Court of the United States found that this statement made the jury's determination that death was the appropriate punishment unreliable, and thus inconsistent with the eighth amendment. The *Caldwell* Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been lead to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639.

In *Caldwell* the prosecutor's remarks were inaccurate and misleading, thus shifting the sense of responsibility for imposing the death sentence from the jury to the appellate courts. The prosecutor made affirmative statements designed to give the jury the idea that their role in the sentenc-

**9.** The expert's report and testimony included the following:

Based on a review of the data available to this examiner, it is my opinion that Mr. Harich was suffering from alcohol idiosyncratic intoxication (DSM III 291.40) in that he showed a marked behavioral change (e.g., aggressive behavior) due to the recent ingestion of a large quantity of alcohol and this behavior is atypical of the person when not drinking. In view of this evaluation, it is certainly likely that because of his state of intoxication, Mr. Harich was not capable of forming the specif-

ic intent to kill, kidnap, or sexually assault the victims, and was in all probability responding impulsively to the emotional strain in his life at that time.

R1–3 (Appendix)—Exh. B; *see* Trial Transcript, Vol. III at 812–22.

**10.** The State of Florida argues that the *Caldwell* claim is procedurally barred. Because the panel opinion correctly disposes of this issue, *see Harich,* 813 F.2d at 1098 n. 17, we see no need to address it further.

ing process was not a serious responsibility. These statements violated defendant's constitutional rights and entitled him to a new trial.

■■■ The relevant question under *Caldwell* is whether remarks made at trial lessened the jury's sense of responsibility toward its role of determining whether the death penalty is appropriate. Although certain language in *Caldwell* could be interpreted broadly, we must consider such language in light of the facts of *Caldwell*. We believe the Supreme Court intended that a *Caldwell* violation should include some affirmative misstatement or misconduct that misleads the jury as to its role in the sentencing process. *Caldwell* does not mandate reversal if an *advisory* jury is told that its role is to advise or to recommend.

In *Adams v. Wainwright*, 804 F.2d 1526 (11th Cir.1986), we held that *Caldwell* mandates the reversal of a conviction where an advisory jury is misled as to the importance of its role. "[T]he jury's role in the Florida sentencing process is so crucial that dilution of its sense of responsibility for its recommended sentence constitutes a violation of *Caldwell*." *Adams*, 804 F.2d at 1530. It is vital that the advisory jury fully understand the gravity of its sentencing decision. The trial court in *Adams*

incorrectly led the jury to believe that the responsibility for imposing the death sentence rested solely upon himself. The trial judge instructed the jury that he could disregard the jury's recommendation, even if the jury recommended life imprisonment. This was incorrect. Florida law allows for an override of the jury's recommendation of life imprisonment only upon a clear and convincing showing that it was erroneous.[11] Furthermore, the trial court told the jury that: "[T]his conscience part of it as to whether or not you're going to put the man to death or not, that is not your decision to make. That's only my decision to make and it has to be on my conscience. It cannot be on yours." *Adams*, 804 F.2d at 1528. *Caldwell* prohibits such attempts to shield the jury from the full weight of its advisory responsibility.

■■■ Under Florida's death penalty statute the jury's role is advisory. After receiving the jury's recommendation, the trial judge must independently weigh the aggravating and mitigating circumstances and render sentence.[12] Therefore, emphasizing the "advisory" role of the jury, or the fact that the jury is making a "recommendation" to the judge, does not support the *Caldwell* claim.[13] Such statements are nei-

11. [T]he jury's recommendation, which represents the judgment of the community as to whether the death sentence is appropriate in a given case, is entitled to great weight, *McCampbell v. State*, 421 So.2d 1072, 1075 (Fla.1982) (per curiam), and may be rejected by the trial judge only if the facts are "so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975) (per curiam). *Adams*, 804 F.2d at 1529.

12. [Florida's death penalty statute provides for bifurcated proceedings in capital cases. First, the jury must determine whether the defendant is guilty of a capital crime. Second, if the defendant is found guilty, the court conducts a separate sentencing proceeding to determine whether the appropriate penalty is death or life imprisonment. Fla.Stat. § 921.141(1). The sentencing phase consists of three subphases. First, the jury considers the mitigating and aggravating evidence and renders an advisory sentence to the court. Fla.Stat. § 921.141(2). Second, the trial court decides whether to accept the jury's recommended sentence. If the court decides to impose the death sentence, it must set forth in writing its findings upon which the

sentence of death is based. Fla.Stat. § 921.141(3). Finally, the judgment of conviction and sentence of death is subject to automatic review in the Supreme Court of Florida. Fla. Stat. § 921.141(4).

The division of authority between the jury and the trial judge under the Florida death penalty statute has been upheld against constitutional challenge. *See Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Spaziano*, the Court made reference to the fact that the jury's recommendation is entitled to some deference by the trial court. 104 S.Ct. at 3165–66.] 813 F.2d at 1100 n. 19.

13. One concern expressed in *Caldwell* was that a sentencing jury "unconvinced that death is the appropriate punishment, ... might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts." The jury might thus tend to sentence the defendant to death " 'because the error may be corrected on appeal.' " The Supreme Court feared that a defendant might thus be executed, "although no sentencer had ever made a determination that death was

ther inaccurate nor misleading.[14]

In the instant case, petitioner contends that the remarks made by the prosecutor and judge improperly diluted the jury's sense of responsibility for their sentencing decision in violation of the Eighth Amendment. [Specifically, the prosecutor told the jury during voir dire that its sentencing decision was a recommendation and that the "court pronounces whatever sentence it sees fit."] Trial Transcript, Vol. I, at 74–75.[15]

The trial court made several similar statements during the guilt/innocence phase. Before the trial began, the court told the jury that it is the jury's duty to determine guilt or innocence, but that "it is the judge's job to determine what a proper sentence would be if the defendant is guilty." *Id.* at 178. In its instructions to the jury at the end of the guilt phase, the court repeated the above statement, Trial Transcript, Vol. II at 732, and also noted:

> I will now inform you of the maximum and minimum possible sentences in this case. The penalty is for the court to decide. You are not responsible for the penalty in any way because of your verdict. . . .

*Id.* at 735–36.

The trial court returned to this theme in the sentencing phase. Before the state began its case, the court told the jurors the following:

> As I advised you, when the charge of the law was given you at the conclusion of

the case, the punishment of this crime is either death or life imprisonment without possibility of parole for twenty-five years. The final decision as to what punishment shall be imposed rests *solely* upon the judge of this court. However, the law requires that you, the jury, render to the court an advisory sentence as to what punishment should be imposed upon the defendant.

*Id.* at 754–55 (emphasis added). The court then told the jurors that their decision should be based on their balancing of the mitigating and aggravating circumstances in the case. After the evidence was presented, the court instructed the jury, in pertinent part, as follows:

> Ladies and gentlemen of the jury, it is now your duty to advise the Court as to what punishment should be imposed upon the Defendant for his crime of first-degree murder. As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge; however, it is your duty to follow the law which will now be given to you by the Court and render to the Court an advisory sentence, based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.
>
> Your advisory sentence should be based upon the evidence which you have

the appropriate sentence." *Caldwell,* 472 U.S. at 331–32, 105 S.Ct. at 2641.

This aspect of *Caldwell* is not applicable to this case. The appellate court in *Caldwell* would have had to rely on appellate briefs and transcripts to make a determination of whether death was appropriate. Although Florida juries play a crucial role in the sentencing process, the trial judge serves as the true sentencer. The Florida trial judge, like the jury, hears firsthand all testimony and evidence.

**14.** We note that the Supreme Court of Florida has held that jury instructions and statements informing the jury that their role is advisory are accurate. *Pope v. Wainwright,* 496 So.2d 798, 805 (Fla.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987); *Aldridge v. State,* 503 So.2d 1257, 1259 (Fla.1987); *Smith v. State,* 515 So.2d 182 (Fla.1987).

**15.** [The prosecutor explained the bifurcation of proceedings in capital cases and then told the jury that, in the sentencing phase:

> [Y]ours is a recommendation to the Court. The Court pronounces whatever sentence it sees fit. But yours is a recommendation, giving some direction to the Court as to what the circumstances show.

Trial Transcript, Vol. I at 74–75. Immediately prior to this statement, the prosecutor warned the jury that the sentencing phase "is a very serious part of the trial and a very serious proceeding." *Id.* at 74. Immediately after this statement, the prosecutor noted that the sentencing phase is not "a proceeding based upon sympathy or based upon any emotion, it is proceeding [sic] based upon law, law and facts." *Id.* at 75.] 813 F.2d at 1098 n. 18.

heard while trying the guilt or innocence of the Defendant and the evidence which has been presented to you in these proceedings.

Trial Transcript, Vol. II, at 914.] 813 F.2d at 1098–99.

■ We do not believe that the challenged comments misled the jury as to the importance of its advisory role. These statements did not create the intolerable danger that the advisory jury's recommendation of the death sentence was unreliable. Neither did they minimize the role of the jury. The statements explained to the jury their role with respect to the judge. The judge also instructed the jury to listen to the evidence, weigh the aggravating and mitigating circumstances, and render an advisory opinion as to the applicability of the death penalty in this case. Neither the prosecutor nor the trial judge implied that the jury's recommendation was superfluous. The fact that the jury knew they were making a recommendation did not detract from the importance of their decision.

■ We agree with the Supreme Court of Florida that comments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* "as long as the significance of [the jury's] recommendation is adequately stressed." *Pope v. Wainwright*, 496 So.2d 798, 805 (Fla.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). After examining the record, we conclude that the court and prosecutor adequately communicated the seriousness of the jury's advisory role. We cannot say that this jury felt anything but the full weight of its advisory responsibility. As a result, petitioner's *Caldwell* claim must fail.[16]

### III. CONCLUSION

For the foregoing reasons we affirm, *in toto,* the denial of relief.

AFFIRMED.

TJOFLAT, Circuit Judge, specially concurring, in which KRAVITCH, HATCHETT, ANDERSON and CLARK, Circuit Judges, join:

I agree fully with the majority's treatment and disposition of petitioner's ineffectiveness of counsel claim. I also agree with the majority's disposition of petitioner's *Caldwell* claim, but I do not agree with its analysis of that claim. The chief defect in the analysis, I submit, is that it focuses too heavily on whether the statements by the prosecutor and the court regarding the sentencing process were accurate in a very technical sense, and does not fully consider whether the jurors were nevertheless left with a misimpression as to the importance of their role. In my view, a proper analysis of the *Caldwell* claim requires an evaluation of how a reasonable juror would have understood the court's statements in the context of the entire trial. Applying this analysis, I conclude, along with the majority, that petitioner's *Caldwell* claim is without merit.

### I.

In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court held that a death sentence is invalid under the eighth amendment if it rests on "a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. Under the Florida capital sentencing scheme, the jury makes a sentencing recommendation and the trial judge actually imposes sentence. Fla.Stat. § 921.141 (1985). Because the trial judge is required by Florida law to give great weight to the jury's sentencing recommendation, this court has held that the concerns voiced in *Caldwell* are triggered when the jury is misled into believing that its sentencing

---

**16.** Petitioner also contends that the prosecutor and trial judge should have informed the jury about the weight accorded its sentencing verdict. The Florida trial judge uses this *Tedder* standard, *see supra* note 11, when determining whether to override the jury's verdict of life imprisonment. We can find no reason why the jury would not take their role seriously simply because the trial judge did not inform them of a rule of law applicable only to him.

role is an unimportant one. *See Mann v. Dugger*, 844 F.2d 1446 (11th Cir.1988) (en banc).

An examination of the trial record in this case reveals the following facts pertinent to petitioner's *Caldwell* claim. In the course of counsel's voir dire of the venire, the prosecutor explained to the prospective jurors that the trial would be in two stages, a guilt phase and a sentencing phase. After describing the jury's function in the guilt phase, he stated that

in the event the State has, in fact, proven its case of guilty of murder in the first degree, then it is necessary for the jury to determine one thing and one thing alone. And that is their recommendation concerning whether the recommendation should be life imprisonment or it should be death. Of course, it is a very serious part of the trial and a very serious proceeding.... [It] is going to be a very vital part of the proceedings, and one which both parties will probably strenuously object as to what recommendations you might should recommend to the Court.

The prosecutor then went on to make the following statement:

Let me add that yours is a recommendation to the Court. The Court pronounces whatever sentence it sees fit. But yours is a recommendation, giving some direction to the Court as to what the circumstances show.

The prosecutor concluded this discussion of the jury's role by telling the prospective jurors that

[y]ou are a fact-finding body. And you must make several findings, or at least in your own mind, before you render verdict, the State has to show you what we call an aggravating circumstance or [there] might be mitigating circumstances. And you are to make a judgment, based upon those proceedings. And so it is a detailed process that we go through.

Once the jury had been selected, the trial judge delivered an opening charge. In that charge, the trial judge explained the jury's role in the following way:

Your duty is to determine if the Defendant is guilty or not guilty, in accordance with the law. It is the Judge's job to determine what a proper sentence would be if the Defendant is guilty.

The trial judge repeated this point verbatim in his instructions to the jury at the close of the guilt phase. The trial judge also instructed the jurors that

[t]he penalty is for the Court to decide. You are not responsible for the penalty in any way because of your verdict. The possible results of this case are to be disregarded by you when you arrive at your verdict. Your duty is to discuss only the question of whether the State has proved the guilt of the Defendant in accordance with these instructions of the law.

The jury returned a verdict of guilty on all charges. The trial judge then convened the sentencing phase of petitioner's trial. In his opening charge to the jurors, the trial judge stated that

[t]he final decision as to what punishment shall be imposed rests solely upon the Judge of this court. However, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the Defendant.

At the conclusion of the sentencing phase, the prosecutor and defense counsel both made closing arguments to the jury. The prosecutor reminded the jurors not to approach their task lightly, stating:

This proceeding which we have at this stage of a murder trial is always a difficult one. And I am sure it applies, likewise, to everyone concerned. Don't think that anyone at any time takes it any lighter than anyone else, by any means.

Defense counsel, in his closing argument, expressly outlined the importance of the jury's sentencing role:

And your recommendation carries great weight. It is true that the Judge, and the Judge alone, decides what the sentence will be. But this is not an exercise in futility for you. For what you decide has more weight for him and for the

Court and for our system than any other single factor in his recommending whether Roy Harich shall suffer death or be imprisoned for life.

After defense counsel concluded his argument, the trial judge delivered the final charge to the jury. In the course of the charge, the judge made the following statement:

As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge; however, it is your duty to follow the law which will now be given to you by the Court and render to the Court an advisory sentence....

The jury then retired for deliberations. Upon returning to the courtroom, it announced a recommendation of death, which the judge followed in imposing sentence.

## II.

I begin my analysis by evaluating the prosecutor's statements. In this case, the prosecutor's misrepresentation of the jury's role consisted of a single isolated statement made in the course of jury selection. In explaining to the prospective jurors how the capital sentencing process functioned, the prosecutor stated that "[t]he Court pronounces whatever sentence it sees fit." This statement, considered by itself, does mischaracterize the nature of the jury's role. As noted above, the trial judge is required under Florida law to give great weight to the jury's recommendation. The prosecutor's statement suggested, contrary to Florida law, that the judge's sentencing prerogatives would in no way be constrained by the jury's recommendation.

In evaluating the impact of the statement on the jurors, however, we cannot ignore the context in which the statement appeared. It was immediately preceded by the comment that the jury's sentencing determination would be a "very serious" and "very vital" juncture in the trial. It was immediately followed by the qualifying re-

mark that the effect of the jury's recommendation would be to "giv[e] some direction" to the trial judge. Although this qualifying remark was not itself entirely accurate, it did at least suggest, consistent with Florida law, that the jury's recommendation would count as a factor in the final sentencing decision. In any event, the prosecutor immediately returned to his earlier theme that the jury's determination would be the focal point of the sentencing phase by stating that the jury was a "fact-finding body" that would be required to reach a sentencing "judgment" based on the evidence presented at the sentencing proceeding.

In my view, the prosecutor's misleading statement about the judge imposing "whatever sentence he sees fit" was effectively undermined by the statements immediately preceding and immediately following it. Those statements suggested that the jury's sentencing determination would be a vital juncture in the trial and would count as a factor in the ultimate sentencing decision. The effect of those statements, if there was any effect, would have been to bolster, not diminish, the jury's sense of responsibility.

The prosecutor made no other statement directly addressing the jury's sentencing role.[1] Although he did not expressly tell the jurors that the trial judge would be required to give great weight to their recommendation, he lodged no objection when defense counsel, in closing argument at the conclusion of the sentencing phase, articulated an explicit and accurate description of the jury's sentencing role:

And your recommendation carries great weight. It is true that the Judge, and the Judge alone, decides what the sentence will be. But this is not an exercise in futility for you. For what you decide has more weight for him and for the Court and for our system than any other single factor in his recommending wheth-

---

1. In his closing argument at the conclusion of the sentencing phase, the prosecutor noted that the capital sentencing decision is "always a difficult one" for "everyone concerned." This state-

ment, construed as an indirect reference to the jury's sentencing role, would only bolster the jurors' sense of responsibility.

er Roy Harich shall suffer death or be imprisoned for life.

The jurors were well aware that objections to statements in closing argument would be entertained; defense counsel had interrupted the prosecutor's closing argument several times, and the prosecutor at one point interrupted defense counsel's closing argument on the ground that defense counsel had misrepresented the law. Thus, the jurors could have interpreted the prosecutor's failure to object to defense counsel's description of the jury's sentencing role as an implicit acquiescence to that description. Such an interpretation would have been entirely logical, since defense counsel's description was not inconsistent with the overall tone of the prosecutor's earlier comments about the importance of the jury's determination.

In light of these considerations, I agree with the majority's conclusion that the prosecutor did not mislead the jurors as to the importance of their sentencing role. That conclusion does not end the matter, however; as we stated in *Mann*, our ultimate focus is on the trial court's actions. We must examine the court's actions and determine whether reasonable jurors, in light of the entire trial, would have been misled as to the importance of their decision. *Mann*, 844 F.2d at 1457. Thus, where the prosecutor has misled the jury, as was the case in *Mann*, *Caldwell* error occurs if the trial court implicitly puts its imprimatur on the prosecutor's statements. By the same token, if the prosecutor has not misled the jury, as I have concluded was the case here, there is no *Caldwell* error provided the trial court does nothing to disturb the nonmisleading impression.[2] If the court does disturb that impression, however, and affirmatively misrepresents

the nature of the jury's role, the constitutional violation is direct and unmistakable.

In my view, none of the trial court's statements disturbed the nonmisleading impression created by the prosecutor. The trial judge first referred to the jury's role during the guilt phase, when he charged the jury. In the course of the charge, the court told the jurors that "[y]ou are not responsible for the penalty in any way because of your verdict." This statement, taken in context, merely reminded the jurors that the guilt and sentencing phases are two distinct phases, and that their decision on guilt should not be influenced by the possibility that the death penalty might be imposed should they return a verdict of guilty. Such a reminder by the trial judge was entirely proper. Although the judge could have made the point with a bit more clarity, any ambiguity as to what he meant was removed by his immediately subsequent statement that "[t]he possible results of this case are to be disregarded by you when you arrive at your verdict."[3]

The trial judge also made reference to the jury's role in his initial and final charges at the sentencing proceeding. In those charges, the judge stated that "the final decision as to what punishment shall be imposed rests solely upon the Judge of this court." This statement, properly analyzed, no more supports a finding of *Caldwell* error than does the earlier statement.

As the majority notes, the statement was technically accurate, at least in the sense that Fla.Stat. § 921.141(3) identifies the trial judge as the actor who actually imposes sentence. That observation is not dispositive of the *Caldwell* issue, however; the dispositive question is how a reasonable juror would have understood the statement in the context of the entire trial. *See Mann*, 844 F.2d at 1457.[4] In *Mann*, the

---

**2.** Under *Caldwell*, the eighth amendment does not require that the capital sentencer be affirmatively instructed as to the importance of its role; it requires only that the sentencer not be misled into believing that sentencing responsibility rests elsewhere.

**3.** The trial judge's statement during the guilt phase that it would be his "job" to determine sentence is properly understood as intended to reinforce this admonition.

**4.** It is also not dispositive to note that the references to the jury's "advisory" function were accurate in the technical sense that Fla.Stat. § 921.141(2) contains the term "advisory." The question remains as to what meaning the jurors would have attributed to that term in light of everything else they were told. As we noted in *Mann*, nothing in the common meaning of the term "advisory" would suggest to the jurors that

trial judge made the very same statement, and we found *Caldwell* error. In that case, however, the prosecutor had specifically and repeatedly downplayed the significance of the jury's role throughout the trial. Thus, when the jury in that case finally heard the judge say that the final sentencing decision rested with the court, they would have likely understood the judge to be saying "yes, the prosecutor has accurately described your role as an essentially meaningless one and I am now reiterating that point." By thus putting its imprimatur on the misimpression created by the prosecutor, the trial court violated Mann's rights under the eighth amendment.

Here, the statement was made by the trial judge under entirely different circumstances. As discussed above, the overall effect of the prosecutor's comments would have, if anything, bolstered the jury's sense of responsibility. Furthermore, the judge's statement was immediately preceded by defense counsel's accurate and explicit description of the jury's role, to which the prosecutor lodged no objection.[5] Under these circumstances, the trial judge's statement, which was technically accurate to begin with, would not have misled the jurors. Rather, the jurors were likely left with something very close to an accurate understanding of the nature of the sentencing process: the trial judge would be the final sentencer, but would be required by law to give great weight to their recommendation. Because the jurors were therefore not misled into believing that their role was an unimportant one, petitioner's sentence is valid under the eighth amendment.

HILL, Circuit Judge, specially concurring:

I fully concur in the court's decision and I agree with the court's resolution of the merits of the *Caldwell* claim. I write only

to express my view that the court need not have reached the merits of the *Caldwell* issue because the claim was procedurally barred.

The court affirms the panel's holding on the question of procedural default, which was based upon the decision in *Adams v. Wainwright,* 804 F.2d 1526 (11th Cir.1986). While I agree that *Adams* supports the panel's decision that the claim was not procedurally barred, I believe that the court, sitting *en banc,* should revisit the default issue decided in *Adams.*

In *Adams,* 804 F.2d at 1530, the court held that *Caldwell* represented a significant change in the law and that the change provided sufficient "cause" to excuse a procedural default. I disagree that *Caldwell* was such a change in the law. It seems to me that a competent litigator in any case would quickly and strenuously object to an argument or jury instruction which led the jury "to believe that the responsibility for determining the appropriateness of [its verdict] rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 1639.

It may be instructive to venture outside of the tangled web of capital case jurisprudence in considering this question. In a typical damage suit, for example, an instruction or argument which led the jury to underestimate its role in the decision making process would be error. The jury may not be told that it need not be concerned about the consequences of its verdict, and I believe that the objections to such statements would be made with or without the guidance of the *Caldwell* decision. Given that, I cannot agree that *Caldwell* represents a significant change in the law.

The court in *Adams* 804 F.2d at 1530 n. 5, noted that *Caldwell*-type claims were not being raised by other defendants at the time of that defendant's trial. The court attributed this to a lack of awareness of the potential claim. There is, however, a

---

the trial judge would be required to give their recommendation great weight.

**5.** In *Mann,* defense counsel also made a reference to the weight that would be accorded the jury's recommendation. That reference, however, was made early in the trial and was direct-

ly contradicted by numerous statements by the prosecutor. For these reasons, we concluded that "when the jurors heard the trial judge say 'as you have been told,' they understood the reference to be to the prosecutor's portrayal of their role." *Mann,* 844 F.2d at 1458 n. 14.

simpler explanation for the scarcity of such claims, namely, the scarcity of *Caldwell*-type violations. I believe that this may, in fact, explain the failure of the present petitioner to raise the claim earlier. It may very well be that he did not fail to recognize the existence of a claim so much as he failed to recognize the existence of a violation because there was, as the court holds, no violation.

The court has, however, held that the *Caldwell* claim in this case was not procedurally barred, and inasmuch as the court reaches the issue on the merits, I concur in the decision that there was no violation.

CLARK, Circuit Judge, specially concurring:

I concur with Judge Tjoflat's opinion in the *Mann* case which finds that there was a *Caldwell* violation. I also concur with Judge Tjoflat's specially concurring opinion in *Harich* which concludes that there is no *Caldwell* violation. I was on the panel in both cases and wrote something with respect to the *Caldwell* issue in each case. *See Mann v. Dugger,* 817 F.2d 1471, 1489 (11th Cir.1987), and *Harich v. Wainwright,* 813 F.2d 1082, 1089, 1098 (11th Cir.1987). I have read the record in both of the cases and agree with Judge Tjoflat and the others concurring with him that there is a meaningful difference.

In a *Caldwell*-type case, it is essential that one determine the jury's perception of its role during the sentencing phase of the trial. That is, was the jurors' collective sense of responsibility lessened when asked to decide whether life or death was the appropriate penalty. The answer depends on an analysis of the particular facts and circumstances of each case. The trial court may explain to the jury its advisory role, "as long as the significance of [the jury's] recommendation is adequately stressed." *Harich v. Wainwright,* 813 F.2d 1082, 1101 (11th Cir.1987) (quoting *Pope v. Wainwright,* 496 So.2d 798 (Fla.1986)).

In *Mann,* the prosecutor made the following statements during the voir dire examination:

The recommendation that you make to Judge Federico in this portion of the trial is **simply a recommendation,** and **he is not bound by it.** He may impose whatever sentence the law permits. He will have been here and will have listened to all of the testimony himself.

\* \* \* \* \* \*

[Y]ou understand **you do not impose the death penalty. That is not on your shoulders. The ultimate decision rests with Judge Federico.**

\* \* \* \* \* \*

Again, **that decision rests up here with the law, with Judge Federico.** You will have the opportunity after you have heard everything there is to hear to make a recommendation to him. **But it is not legally on your shoulders,** though. **It is not your ultimate decision.** You act in that regard in an **advisory capacity only.**

817 F.2d at 1489 (emphasis added).

Following are the judge's comments at the beginning of the sentencing proceeding:

The punishment for this crime is either death or life imprisonment. The final decision as to what punishment shall be imposed rests **solely with the judge** of this court. However, the law requires that you, the jury render to the court an **advisory sentence** as to what sentence should be imposed on the defendant.

*Id.* (emphasis added). It is clear from the above that the prosecutor and the court misled the jury as to its responsibility. The last thought left with the jury by the prosecutor in his closing argument at sentencing replayed his earlier statements:

What I'm suggesting to you is that the ultimate responsibility for the imposition of the sentence rests with Judge Philip Federico. That is his sworn position in the system. He's heard everything you have heard. He may have the opportunity to learn more before he imposes a sentence.

Transcript at 2439. The foregoing flagrant misstatement by the prosecutor was followed soon thereafter by Judge Federico's

instructions to the jury, which included the following:

Ladies and Gentlemen of the jury, it is now your duty to advise the court as to what punishment should be imposed on the defendant for his crime of murder in the first degree. *As you have been told,* **the final decision as to what punishment shall be imposed is the responsibility of the judge.** However, it is your duty to follow the law which will now be given to you by the court and render to the court an **advisory opinion** based upon your determination....

817 F.2d at 1490 (emphasis added). Clearly the jurors' perception of their role was minimized by the prosecutor's statement and then the trial court's endorsement when the court said "as you have been told...." The defense attorneys did not address the role of the jury in their closing arguments, making clear that the judge's reference was to the prosecutor's misdescription of the jurors' role.

The circumstances of this case indicate there was an intolerable danger that the jury recommended the death penalty because it did not understand that its recommendation would, to some extent, bind the trial court to a particular result. The jurors heard compelling mitigating evidence that Mann suffered from psychotic depression, and that he committed this crime during a fit of pedophilic rage. They were told that Mann attempted to commit suicide by slashing his forearms shortly after the crime had been committed. He had attempted suicide several times in the past. When the police came to his aid on the day of the murder, Mann said he had done something stupid and needed help. At the sentencing hearing, a psychiatrist testified that Mann committed the crime while under the influence of an extreme mental or emotional disturbance. The victim, a 10 year-old girl, intensified his feelings of guilt regarding his pedophilic instincts, thus channeling his self-destructive rage into an act of violence. Faced with a difficult decision, the jurors were quite susceptible to a suggestion that the sentencing decision was "not on [their] shoulders." The improper comments in this case cre-

ated the "intolerable danger" that the advisory jury gave its recommendation without truly understanding its proper role.

With respect to the identical issue in the *Harich* case, the prosecutorial and judicial comments in this case did not minimize the role of the jury. The statements went no further than explaining to the jury the respective functions of the judge and jury. The jury was told to listen to the evidence, weigh the aggravating and mitigating circumstances and render an advisory opinion as to the applicability of the death penalty in this case. Nothing was said which would imply to the jury that its recommendation was superfluous or that the importance of the jury's decision was lessened by the fact that it was only a recommendation. Upon examination of the record, one concludes that the seriousness of the jury's advisory role was adequately communicated by the court and prosecutor. As mentioned in the discussion of the *Mann* case, the Florida Supreme Court has stated that comments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* "as long as the significance of [the jury's] recommendation is adequately stressed." *Pope v. Wainwright,* 496 So.2d 798 (Fla.1986).

In distinguishing between *Mann* and *Harich,* it is necessary to analyze the context in which the statements are made with respect to the jury's sense of responsibility for its sentencing decision. In *Mann* there were a number of statements by the prosecutor which reduced the jurors' perception of their duty vis-a-vis the judge's duty, and the court's comments in *Mann* gave emphasis to what the prosecutor had said. However, in *Harich,* there is very little to which one can point that was said by the prosecutor that would have misled the jury. Judge Vance in his dissent at page 1483 recites one statement by the prosecutor. The balance of the statements in that dissent are quotations from what the trial judge told the jury and those statements read in the context of the total instructions and comments of both counsel do not reduce the importance of the jury's role during the sentencing phase. At page 1483 of

his special concurrence, Judge Tjoflat points out statements by the trial judge and defense counsel which emphasize the importance of the juror's responsibility. Similar statements are not found in the *Mann* trial.

Thus, I have no trouble in joining the majority in *Mann* that the writ be issued unless a new trial is granted, and also concurring with the majority in *Harich* that the petition be denied.

VANCE, Circuit Judge, concurring in part and dissenting in part, in which JOHNSON, Circuit Judge, joins:

I agree with the majority that petitioner is not entitled to relief on his ineffective assistance of counsel claim. I also agree that a *Caldwell* violation requires inaccurate or misleading statements. I further agree with Judge Tjoflat that the *Caldwell* analysis should focus on whether the inaccurate or misleading remarks left the jury with a misimpression as to the importance of its role. After reviewing the record in this case, however, I believe that the remarks made by the prosecutor and the trial court, considered in the context of the entire trial, left the jury with an inaccurate sense of its role. I therefore must conclude that *Caldwell* requires that we grant petitioner relief on this ground.

### I.

In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), a majority of the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. This is because "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 105 S.Ct. at 2641–42. Thus when the trial court and the prosecutor misled the jury into believing that the responsibility for sentencing rested with the Mississippi ap-

pellate court, which was inaccurate under state law, the resulting sentence did not meet the eighth amendment's standard of reliability. *Id.* at 341, 105 S.Ct. at 2646.

The translation of the *Caldwell* issue from Mississippi to Florida requires us to focus on Justice O'Connor's concurring opinion in *Caldwell*. A plurality of four justices found that the statements to the jury regarding appellate review were both inaccurate and irrelevant. *Id.* at 336, 105 S.Ct. at 2643. Justice O'Connor, who provided the fifth vote for vacating the petitioner's death sentence, based her decision only on the ground that the statements were inaccurate. *Id.* at 341–42, 105 S.Ct. at 2646 (O'Connor, J., concurring in part and concurring in the judgment). Justice O'Connor did not agree with the plurality that "the giving of *nonmisleading* and *accurate* information regarding the jury's role in the sentencing scheme is irrelevant to the sentencing decision." *Id.* at 341, 105 S.Ct. at 2646 (O'Connor, J., concurring in part and concurring in the judgment) (emphasis in original). I therefore agree with the majority that statements to the jury must be inaccurate or misleading, and not merely arguably irrelevant, before we will find a *Caldwell* violation. *See Mann*, 844 F.2d at 1454–55.

Under Florida's sentencing scheme the jury renders an advisory sentence. The trial judge then independently weighs the evidence from the sentencing phase before entering the sentence. Fla.Stat. § 921.141 (1985). It is therefore technically accurate and not misleading to tell a jury in Florida that its sentence is "advisory." "Emphasizing" the advisory nature of the jury's sentencing recommendation also does not necessarily constitute *Caldwell* error. *See ante* at 1472–74. As we held in *Mann*, however, there are still ways to mislead a Florida jury by minimizing its perception of its role in the sentencing scheme. *Mann*, 844 F.2d at 1454, 1457–58; *see ante* at 1475 (Tjoflat, Circuit Judge, specially concurring).

A Florida jury plays an important and significant role in the Florida capital sentencing scheme. Florida law requires the trial judge to give great weight to a jury's recommendation. *See Grossman v. State*,

525 So.2d 833, 839 n. 1, 13 Fla.L.Weekly 127, 133 n. 1 (1988); *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975); *see also Spaziano v. Florida*, 468 U.S. 447, 465, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984) (*Tedder* standard affords capital defendant in Florida significant safeguards, and Florida Supreme Court takes the standard seriously); *Proffitt v. Wainwright*, 756 F.2d 1500, 1503 (11th Cir.1985) (Florida law requires so much deference to jury's advisory opinion that trial judge must give explicit reasons for choosing death if the jury recommends life). Before a trial judge in Florida may override a jury recommendation of life imprisonment, the judge must find that the facts are so clear and convincing that virtually no reasonable person could differ. *Combs v. State*, 525 So.2d 853, 857, 13 Fla.L.Weekly 142, 144 (1988); *see also Dobbert v. Florida*, 432 U.S. 282, 295–96, 97 S.Ct. 2290, 2299–2300, 53 L.Ed.2d 344 (1977) (*Tedder* rule provides crucial protection so that defendants are not disadvantaged with respect to a jury's recommendation of life). The Florida Supreme Court's recent decisions in *Grossman* and *Combs* emphatically reaffirm this principle of Florida law. *Cf. Grossman*, 525 So.2d at 847, 13 Fla.L. Weekly at 134 (Shaw, J., specially concurring) (Florida's scheme for imposing the death penalty would pass master without *Tedder*); *Combs*, 525 So.2d at 859, 13 Fla. L.Weekly at 144 (Shaw, J., specially concurring) (questioning whether the *Tedder* rule is still viable). The *Caldwell* issue therefore turns on whether the jurors had an accurate perception of this role when they sentenced petitioner to death.

## II.

After reviewing the record in this case in light of *Caldwell*, I must conclude that the jury was misled as to its role under Florida law. Both the prosecutor and the trial court made misleading and inaccurate statements to the jury throughout the trial. Although the majority and Judge Tjoflat attempt to soften the impact of these statements, I am unable to do so.

During voir dire the prosecutor introduced the jury to its role in the sentencing phase:

> Let me add that yours is a recommendation to the Court. The Court pronounces whatever sentence it sees fit. But yours is a recommendation, giving some direction to the Court what the circumstances show.

This is both inaccurate and misleading. It is inaccurate because the sentencing jury under Florida law gives more than *some* direction to the trial court. It gives *considerable* direction. It is also misleading because to say that the trial court may pronounce whatever sentence it sees fit implies that the trial judge need not pay any attention at all to what the jury recommends. Thus the jurors were presented with an inaccurate and misleading conception of their role from the very beginning of the trial.

Rather than finding that other statements by the trial court "effectively undermined" this inaccurate and misleading statement, I conclude that subsequent events exacerbated the jury's misconception of its role. For example, immediately before the prosecutor's opening statement, the trial court told the jury:

> Your duty is to determine if the Defendant is guilty or not guilty, in accordance with the law. It is the Judge's job to determine what a proper sentence would be if the Defendant is guilty.

While this may be accurate it is misleading. By omitting the fact that it is in part the jury's job to determine the proper sentence, the trial court reinforced the prosecutor's inaccurate and misleading remarks at voir dire.

At the end of the guilt phase, the trial court, rather than correcting any misconception, repeated this misleading statement to the jury verbatim. The trial court added:

> I will now inform you of the maximum and minimum possible sentences in this case. The penalty is for the Court to decide. You are not responsible for the penalty in any way because of your verdict.

This is at least misleading. It is true, as Judge Tjoflat suggests, that this statement reminded the jurors that the guilt phase is distinct from the sentencing phase, and

that their decision in the guilt phase should not be influenced by the possibility of the death penalty as the punishment. *See ante* at 1478–79 (Tjoflat, Circuit Judge, specially concurring). The statement, however, is a misleading way to communicate this fact to the jury.

In charging the jury at the beginning of the sentencing phase, the trial court stated:

> As I advised you, when the charge of the law was given you at the conclusion of the case, the punishment of this crime is either death or life imprisonment without possibility of parole for twenty-five years. The final decision as to what punishment shall be imposed rests solely upon the Judge of this court. However, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the Defendant.

This statement is not only inaccurate and misleading (the final decision does not rest *solely* with the trial judge), it also results in the exact "imprimatur" condemned in *Mann. See Mann,* 844 F.2d at 1457–58. By opening this inaccurate and misleading statement with the words "as I advised you," the trial judge "expressly put the court's imprimatur" on all the previous misleading statements made to the jury. *Id.; see also Caldwell,* 472 U.S. at 339, 105 S.Ct. at 2645 ("trial judge in this case not only failed to correct the prosecutor's remarks, but in fact openly agreed with them").[1]

In light of these statements I cannot agree with the majority that this jury felt the full weight of its advisory responsibility. Nor can I agree with Judge Tjoflat that these jurors "were likely left with something very close to an accurate understanding of the nature of the sentencing

process...." *Ante* at 1479 (Tjoflat, Circuit Judge, specially concurring). At best, the statements likely left some jurors confused as to their proper role. *Mann,* 844 F.2d at 1458. At worst, the statements misled the jurors. *Cf. Peek v. Kemp,* 784 F.2d 1479, 1489 (11th Cir.) (in banc) ("ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner"), *cert. denied,* —— U.S. ——, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). Although I view this as a closer case than *Mann,* I must conclude that *Caldwell* requires us to vacate this petitioner's death sentence as well.

### III.

I recognize that the Florida Supreme Court, confronted with this very issue, has held recently that the jury's role in Florida's sentencing scheme is sufficiently different from the jury's role in Mississippi's scheme so that *Caldwell* does not apply to Florida cases. *Grossman,* 525 So.2d at 839–40, 13 Fla.L.Weekly at 129–30; *Combs,* 525 So.2d at 855, 13 Fla.L.Weekly at 143. We are not bound, however, by a state court's application of federal constitutional principles. *Mann,* 844 F.2d at 1454 n. 10. We must independently decide whether Florida's sentencing process, as defined by that state's courts, violates *Caldwell* in a given situation.[2]

Applying these principles, I am forced to conclude that because the jury was misled as to its role, there is no way around *Caldwell.* I recognize that the United States Supreme Court may not have intended *Caldwell* to apply to Florida's sentencing scheme. I believe, however, that the *Caldwell* opinion requires that we vacate petitioner's sentence.

---

**1.** The trial court's statement is actually worse than the statement made by the trial court in *Mann.* In *Mann,* we found that by stating to the jury "as you have been told," the trial court put its imprimatur on misleading remarks made previously by the prosecutor. In this case, the trial court reinforced the jury's inaccurate sense of its role by reaffirming the court's own inaccurate and misleading statements.

**2.** In *Grossman,* for example, the Florida Supreme Court found no *Caldwell* violation because it was "not persuaded that the weight

given to the jury's advisory recommendation is so heavy as to make it the de facto sentence[r]." 525 So.2d at 840, 13 Fla.L.Weekly at 130. This is not, however, the proper inquiry under the federal constitution. In *Combs* the Florida Supreme Court distinguished *Caldwell* because of the statutory description of the jury's role as "advisory." 525 So.2d at 855, 13 Fla.L.Weekly at 143. As we held in *Mann,* however, the legislature's use of this word is not determinative of the *Caldwell* issue. *See Mann,* 844 F.2d at 1450.

The multitude of opinions in this case and various approaches to the *Caldwell* issue in Florida highlights the considerable uncertainty in this area. This uncertainty extends to the justices of the Florida Supreme Court. *Compare Combs*, 525 So.2d at 858, 13 Fla.L.Weekly at 144 (refusing to apply *Caldwell* to Florida's standard jury instructions) *with Grossman*, 525 So.2d at 851, 13 Fla.L.Weekly at 136 (Barkett, J., concurring in part, dissenting in part) (*Caldwell* applies to the Florida advisory jury as well as the trial judge, since both exercise sentencing discretion). *Caldwell* casts doubt on a great number of Florida death sentences. The United States Supreme Court has granted certiorari in a Florida case involving a *Caldwell* claim. *See Adams v. Wainwright*, 804 F.2d 1526 (11th Cir.1986), *modified sub nom*, 816 F.2d 1493 (11th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988). I hope the Court will clarify the law in this area. Because the petitioner in this case was sentenced to death in violation of *Caldwell* as I read that opinion, I respectfully dissent from part II.B of the majority opinion in this case.