**Roy Allen STEWART,
Petitioner-Appellant,**

v.

**Richard L. DUGGER, As Secretary,
Department of Corrections, State
of Florida, Respondent-Appellee.**

No. 86–5800.

United States Court of Appeals,
Eleventh Circuit.

June 9, 1988.

Robin H. Greene, Sp. Asst. Public Defender, Coral Gables, Fla., for petitioner-appellant.

Calvin Fox, Asst. Atty. Gen. of Fla., Miami, Fla., for respondent-appellee.

Before RONEY, Chief Judge, and HILL and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Roy Allen Stewart brought this federal habeas petition challenging his sentence of death. His petition sets forth four claims for relief; (1) comments made by the trial judge diminished the role of the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), (2) improper exclusion of a juror in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), (3) ineffective assistance of counsel at sentencing, and (4) racial discrimination in imposing the death penalty. The federal district court denied relief on all four claims. We affirm.

The facts surrounding Stewart's 1979 conviction are sufficiently detailed by the Florida Circuit Court's order denying state habeas relief:

The victim, Margaret Haizlip, a woman of small physical stature, in her late seventies, was a pioneer of South Florida living in a small home across from Stewart's temporary residence. About 10:00 p.m. Mrs. Haizlip was out on her porch and saw Stewart. She waived [sic] to him, invited him into her home and fixed him a sandwich. Shortly thereafter he went to her bathroom and stole a gold watch from the medicine cabinet. Mrs. Haizlip, after going into the bathroom confronted the defendant, apparently about the stolen watch, whereupon Stewart beat and pummelled Mrs. Haizlip unmercifully about her ribs, face and head. While so doing, the defendant was tearing the clothing and ultimately the underwear from her body. As she lay on the floor, bleeding from her face, moaning and "making noises," the defendant forcibly had sexual intercourse with her in a manner so vicious so as to tear her vagina. The defendant thereupon fastened a cord with an iron attached to it around her neck, pulled tightly on the cord and thereby strangled her leaving a ligature mark on her neck.

The medical examiner testified the victim suffered eight broken ribs, multiple contusions, and her larynx was broken. A bite mark was identified on her thigh, and what appeared to be a bite mark was on her breast. There were blood stains and disarray in the living room and bedroom area of her house, indicating the victim was fighting and running for her life. The defendant left the victim at the scene with blood on his hands.

Sentence Order dated July 26, 1979 at 3–4.

On September 19, 1986, the governor of Florida signed a death warrant (Stewart's second). Stewart's execution was subsequently scheduled to occur on October 7, 1986. Stewart commenced various collateral attacks in state court; a previous round of state collateral attacks had proved unsuccessful. After Stewart's claims were rejected a second time by the Florida state courts, Stewart commenced this federal habeas proceeding. On October 5, Stewart's petition was denied by the United States District Court for the Southern District of Florida. The district court, however, granted a certificate of probable cause to appeal, but denied a stay of execution. In view of the fact that the district court had granted a certificate of probable cause to

appeal, we granted a stay of execution. *Stewart v. Wainwright,* 802 F.2d 395 (11th Cir.1986); *see* Eleventh Circuit Rule 22–3; *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

## I. COMMENTS IMPLICATING *CALDWELL V. MISSISSIPPI*

### A. Legislative Predetermination of the Sentence

■ Stewart contends that comments made during *voir dire* diminished the role of the jury in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). During *voir dire,* the trial court asked the following question of a juror:

Just briefly, let me ask you about capital punishment. We have to ask this question, ... because this is one of those cases where the legislature has said that the death penalty is the appropriate penalty.

Trial Transcript at 409. Stewart claims the impact of this statement was compounded by the judge's earlier comment to the jury that: "You will assume that all the proper evidence and the proper law will be presented to you." *Id.* at 358–59.

Stewart argues the effect of the judge's comment was to instruct the jury that the appropriateness of his execution had already been decided by the state legislature. In the context of the entire trial, however, it is clear that the jurors were under no such impression. Although the trial judge's question to the prospective juror was inartfully phrased, the trial judge intended to convey the message (1) that the legislature had determined the death penalty to be appropriate in the narrow class of homicides in which aggravating circumstances are present, (2) that the prosecutor intends to present evidence of such aggravating circumstances in this case, and (3) that the jury may impose death if aggravating circumstances outweigh mitigating circumstances. Throughout *voir dire,* the jury was informed that not all murders call for capital punishment and that a finding of guilt as to first degree murder does not require a verdict of death. *Id.* at 275, 344, 348, 415, 419, 482, 490, 506, 566. On at least eighteen occasions the trial judge referred to the fact that death can only be imposed under appropriate circumstances. *Id.* at 298, 299, 302, 309, 397, 400, 407, 441, 458, 461, 463, 479, 480, 513, 518, 526, 527, 550; *see also id.* at 535, 567–68 (comments of counsel). The jury was specifically informed during *voir dire* that they would be required to weigh aggravating and mitigating circumstances during the sentencing phase. *Id.* at 392, 444. Furthermore, the terms aggravating and mitigating circumstances were defined during *voir dire. Id.* at 530–33. Most significantly, the jury was informed that the legislature has only enacted guidelines as to when the sentence of death is appropriate. *Id.* at 203, 213, 347, 348, 371, 563. No error occurred in this regard.

### B. The Advisory Role of the Jury

Our *Caldwell* analysis, however, does not end here. During the course of reviewing the *Caldwell* claim raised by Stewart, this court noticed other occasions where the defense counsel, the prosecutor, and the trial judge touched on functions of the jury which might have been asserted as implicating *Caldwell* in a manner different from that which had been suggested by Stewart. The court requested supplemental briefing on this issue; those briefs have been received and considered. We conclude that no *Caldwell* violation occurred.

It may not be inappropriate to indulge in a brief and elementary discussion of the interests and aspirations of the parties during the selection of a jury for the trial of a capital case.

Beyond question, the defendant would prefer to have on the jury those in the community who oppose the death penalty or have misgivings about its imposition. Where the state is seeking the death penalty, the prosecutor, as advocate, would prefer those who find death to be an appropriate penalty.

During the questioning of prospective jurors on *voir dire,* much can be learned about their inclinations, predilections, and

deeply held convictions and biases. Some indicate that they are opposed to the death penalty. A prospective juror does not for that reason alone become disqualified to serve, *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but it can fairly be said that, all other things being equal, the defendant would desire to have that juror serve and the prosecutor would have misgivings about him or her.

There are two ways of eliminating a prospective juror from the final jury. Each side of the case is entitled to a limited number of peremptory strikes and can eliminate prospective jurors without any stated reason. Fla.Stat.Ann. § 913.08 (West 1985); Fla.R.Crim.P. 3.350 (West 1975 and Supp.1987). The trial counsel prefers to conserve these very valuable peremptory strikes and therefore prefers that the undesirable person be eliminated without the expenditure of a peremptory. Sometimes this can be accomplished by demonstrating that the prospective juror is disqualified. Fla.Stat.Ann. §§ 913.03, 913.-13 (West 1985).

There are a variety of disqualifications. Here, however, we are concerned only with the disqualification resulting from the prospective juror's feelings about capital punishment. If the juror's opposition to the death penalty is so strong that it would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," the juror would be disqualified. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (footnote omitted), (quoting *Adams*, 448 U.S. at 45, 100 S.Ct. at 2526); *see Campbell v. State*, 227 So.2d 873, 876–77 (Fla.1969), *cert. dismissed sub nom. Campbell v. Florida*, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970); Fla.Stat.Ann. § 913.13 (West 1985).

When a prospective juror has expressed disapproval of the death penalty on *voir dire*, the prosecutor, as trial advocate, has an interest in demonstrating that this disapproval is so great that the juror, being unable or unwilling to follow the law, is disqualified. On the other hand, defense counsel, wishing to have this juror remain qualified to serve, would be interested in developing from the juror a statement that, under certain circumstances, the juror's reluctance vis-a-vis capital punishment might be overcome so that the juror could, in some posited case, vote in favor of capital punishment.[1]

With that background, we address the rule of law laid down in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed. 2d 231 (1985) which has been the subject of lively discussion in this court with respect to the sentencing phase of the Florida trifurcated capital trial procedure.[2] *Cald-*

---

1. While reviewing here the natural tendencies and inclinations of counsel representing the two sides of the case, we bear in mind that the lawyer representing the state is under a moral and legal compulsion, also, to bring out the true facts and to see to it that the defendant be not deprived of any constitutionally guaranteed right. The prosecuting attorney lived up to this duty. For example, at *voir dire* he told the prospective jurors that the "indictment ... does not mean that the defendant is guilty," Trial Transcript at 167; that "the State of Florida ... must prove the indictment," *id.;* that "the defendant, as he sits here right now, is presumed innocent," *id.;* that "the defendant, in every criminal case, enters the courtroom with this presumption of innocence," *id.* at 168; and that "you must look upon the defendant as being presumed innocent, because you've heard no evidence. I want to make that point very clear." *Id.* The prosecutor told the jury that "[t]he state has the burden of proof. The defendant does not have to prove anything." *Id.* He also stated

that "[t]he State must prove its case beyond and to the exclusion of every reasonable doubt." *Id.* at 168–69. It is not surprising that this prosecutor did not mislead prospective jurors into ill-advised statements that they were disqualified due to their unwillingness to sentence anyone to death.

2. *See Mann v. Dugger*, 817 F.2d 1471, 1481–83 (11th Cir.1987), *reh'g granted and opinion vacated*, 828 F.2d 1498 (11th Cir.1987); *Mann*, 817 F.2d at 1485–86 (Fay, J., dissenting); *id.* at 1489–90 (Clark, J., specially concurring); *Harich v. Wainwright*, 813 F.2d 1082, 1098–1101 (11th Cir.1987), *reh'g granted and opinion vacated sub nom. Harich v. Dugger*, 828 F.2d 1497 (11th Cir.1987); *Adams v. Wainwright*, 804 F.2d 1526, 1528–33 (11th Cir.1986), *modified on reh'g sub nom. Adams v. Dugger*, 816 F.2d 1493, 1494–1501 (11th Cir.1987) *cert. granted sub nom. Dugger v. Adams*, —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988); *Funchess v. Wainwright*,

*well*'s rule is to the effect that jurors who are called upon to serve in the sentencing phase of a capital case must not be misled into believing that their responsibility is less than it really is under the law. Our recent discussions of the *Caldwell* rule have resulted from the fact that the function of the jury in a capital case in Florida, insofar as sentencing is concerned, is not final. Fla.Stat.Ann. § 921.141 (West 1985); *Foster v. State,* 518 So.2d 901, 902 (Fla. 1987); *Herring v. State,* 446 So.2d 1049, 1056 (Fla.1984), *cert. denied sub nom. Herring v. Florida,* 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984); *Thompson v. State,* 328 So.2d 1, 5 (1976). Under the Florida death penalty law, the jurors, after finding the defendant guilty of first-degree murder, are required to hear and consider any further evidence touching upon aggravating circumstances, mitigating circumstances, the crime, and the defendant, and then return an advisory verdict in favor of the death penalty or in favor of life imprisonment without eligibility for parole for 25 years. The judge presiding at the trial actually imposes the sentence which may be, under certain circumstances, agreeable to the advisory verdict or different. Thus, the final responsibility as to sentence rests upon the judge. Fla.Stat.Ann. § 921.141 (West 1985).

With that painfully redundant background, we turn to the case at bar. During *voir dire* prospective jurors were individually submitted to probing questions put to them by the judge, the prosecutor, and defense counsel. Responses ranging across the spectrum of human personality were elicited. A number of prospective jurors expressed great reluctance to impose the death penalty on anyone no matter how clearly guilty of gruesome capital crime that person might be shown to be. In the nature of things, defense counsel exhibited a genuine interest in seeing to it that such a juror remained qualified to serve so that the jury trying the case would include one or more of those jurors or, in the alternative, the prosecutor would be required to exercise a peremptory strike to remove that juror and no longer have that peremptory available to remove some other juror who might be more attractive to the defense than to the state. Therefore, it was important to defense counsel that the juror not state unequivocally that he or she could not, under any circumstances, vote in favor of the death penalty.

It may reasonably be expected that the sensitivity of a juror to the task of deciding life versus death rises as the decision approaches finality. A juror opposed to the death penalty might feel able to consider *advising* that it be imposed while being unable or unwilling to consider participating in its final imposition. Indeed, that is the teaching of *Caldwell, Adams, Harich* and *Mann.* Therefore, it became in the *defendant's* best interest that the jurors who expressed death penalty reluctance be informed and advised that the jury verdict would be but an advisory verdict with ultimate responsibility for sentencing resting upon the judge. A juror opposed to the death penalty, but willing to follow the law as a member of an advisory jury, may well be better for a capital defendant than one not opposed to the death penalty who believes he is serving on a final sentencing jury. In this case, defense counsel did probe deeply into the understanding of Florida sentencing procedure by those jurors who had expressed opposition to the death penalty, undertaking to prevent their saying that they could never vote in favor of the death penalty by calling their attention to the fact that they would not be finally responsible for sentence. *See* Trial Transcript at 222, 223, 242, 552.

At first blush, it appears that we are faced with a paradox. *Caldwell* and its progeny indicate a constitutional right of the defendant to have a jury made up of persons who are aware of and impressed with the heavy responsibility of their sentence verdict. On the other hand, *Witherspoon* forbids the exclusion of a prospective juror for cause if he or she has ex-

788 F.2d 1443, 1445 (11th Cir.1986), *cert. denied,* 475 U.S. 1133, 106 S.Ct. 1668, 90 L.Ed.2d 209 (1986); *Thomas v. Wainwright,* 788 F.2d 684,

693–94 (11th Cir.1986) (Johnson, J., dissenting), *cert. denied,* 475 U.S. 1113, 106 S.Ct. 1623, 90 L.Ed.2d 173 (1986).

pressed only general reservations about the death penalty; this clearly implies that a defendant participating in the selection of a jury for his capital trial is entitled to probe the mental attitudes, biases, and predilections of the prospective jurors and is entitled to rehabilitate jurors whose predilections are in the defendant's best interests but whose first responses on *voir dire* indicate likely disqualification. *See* n. 3 at 17.

■ We resolve this apparent paradox by stating simply that jurors and prospective jurors are not to be misled. Jurors disinclined towards the death penalty are not to be misled into believing that, under the Florida law, if the jury returns a verdict in favor of the death penalty the defendant is automatically doomed. Those who could, in Florida, return an advisory verdict in favor of the death penalty so long as theirs was not the final responsibility, must be considered qualified to serve even though, if the jurors had final responsibility, they could not return such a verdict. On the other hand, the function of the jury and of the individual jurors must not be belittled by misstatement of the law. The defendant is entitled to have the jury made fully aware that the results of the sentencing deliberations will play an important part in the sentencing process. The law in Florida vis-a-vis the function of the judge and the jury in capital case sentencing is not arcane. A clear statement of the law as it exists is not unconstitutional. If there be any areas of potential dispute as to how the law should be paraphrased for *voir dire* inquiry, it may safely be said that the use of the version put to jurors by the defendant's counsel, as set out *infra*, will not violate the rights of the defendant.

The approach taken in this case by the defendant may be discerned from interrogations of one witness, typical of a number of others. A Mrs. Thibodeau was a prospective juror put upon the parties at the *voir dire*. Counsel for the state, Attorney Godwin, had been interrogating another member of the array, a Mrs. Bouquio. Mr. Godwin had asked an entire group of jurors whether or not any of them had "any per-

sonal beliefs or personal philosophies or personal moral convictions that would affect you from sitting in [sic] of a human being, religious of philosophical beliefs?" In response to that question, Mrs. Bouquio had indicated some definite reluctance vis-a-vis capital punishment. Trial Transcript 170–172.

On her own motion, prospective juror Thibodeau made it known that she had the same reservations as did Mrs. Bouquio. *Id.* at 172. After the state's attorney had interrogated, defense counsel, Mr. Goldstein, was allowed to question the prospective jurors. His dialogue with Mrs. Thibodeau was as follows:

MR. GOLDSTEIN: Mrs. Thibodeau, you stated that you would rather not sit on this jury.

I don't think that anybody, if they really searched their soles [sic], really wants to be in a position of making decisions like you have to be called upon to make here. But, in order for our society to go on and function, we have a duty. We have all got a duty.

Do you understand?

MRS. THIBODEAU: Yes.

MR. GOLDSTEIN: Do you think you could put those conceptions aside and listen to the evidence and make a decision based on your personal experiences and backgrounds and interpret whatever evidence is laid out here before you or whatever testimony you hear, and sit back there with the other eleven people and arrive at a verdict of guilty or not guilty?

MRS. THIBODEAU: I could.

THE COURT: Do you think you could do that?

MRS. THIBODEAU: Yes, I could.

THE COURT: What did you say? I didn't hear you.

MRS. THIBODEAU: I could.

MR. GOLDSTEIN: Do you understand, that it is only if you find the defendant guilty of first degree murder, that you would even have to go in there and discuss capital punishment. Do you understand that?

MRS. THIBODEAU: Yes.

MR. GOLDSTEIN: The first burden is the one that the State has to prove first degree murder.

Do you understand that?

MRS. THIBODEAU: Yes.

MR. GOLDSTEIN: If they do prove first degree murder, then they would have to come back here and all be brought back and then they would have to prove to you that you should recommend capital punishment.

Now, do you understand that that is a recommendation? You are not sentencing the defendant to anything.

Do you understand that?

All you are called upon is to make a recommendation.

Do you understand?

MRS. THIBODEAU: Right.

MR. GOLDSTEIN: That recommendation may or may not carry any weight with the Judge. Do you understand that?

MRS. THIBODEAU: You can recommend if six out of the eleven say that we want him electricuted [sic] is fine?

MR. GOLDSTEIN: Fine. The other five, obviously, said no.

Now, you, make your recommendation to the Judge. The Judge does not have to follow it. She can do whatever she wants.

Do you understand that?

MRS. THIBODEAU: Yes.

MR. GOLDSTEIN: Do you think you can handle that?

MRS. THIBODEAU: If I have to.

MR. GOLDSTEIN: You could follow the law, right?

MRS. THIBODEAU: Right.

MR. GOLDSTEIN: You have followed the law all of your life?

MRS. THIBODEAU: Yes.

MR. GOLDSTEIN: You wouldn't have problems following the law, now, would you?

MRS. THIBODEAU: It is not an easy decision.

MR. GOLDSTEIN: Nobody ever said it is. Hopefully, you won't have to make the decision. But, if it comes to it, all that the Judge wants to know is will you follow the law? It is as simple as that. You have followed it all your life. There is no reason you wouldn't, now, right?

MRS. THIBODEAU: (No response.)

*Id.* at 240-43.

In summary, we conclude that Stewart is not entitled to complain, in a petition for federal habeas corpus, that the jurors' sense of responsibility for the verdict was diminished by having the advisory nature of the jury's role called to their attention on *voir dire*. Defense counsel made comments directed toward this end, and did not object to similar comments made by the prosecutor and the trial judge. Addressing this issue at *voir dire* was probably beneficial to the defense, in that it increased the probability that a juror opposed to the death penalty might be empaneled. A prospective juror who could not bring himself to *impose* the death penalty might nevertheless find within himself the ability to *recommend* the death penalty. Making the advisory nature of the jury's role clear at *voir dire* thus results in a greater likelihood that a person opposed to the death penalty may nevertheless serve on the jury; such a person is clearly an ally of the defense.[3]

---

3. Since this line of questioning at *voir dire* is potentially beneficial to the defense, we can envision a situation where the prosecutor would object to questions by defense counsel as to whether a death-scrupled potential juror could nevertheless vote to recommend the death penalty under the Florida advisory arrangement. As there was no such objection in this case, we do not decide whether it is a defendant's constitutional right to pursue this line of questioning over objection by the prosecution. However, as discussed *supra*, a defendant is entitled to inquire whether a juror's opposition to the death penalty would prevent him from impartially performing his duties as a juror. *Witherspoon* teaches that a venireperson must express more than general objections to the death penalty in order to be excluded for cause. 391 U.S. at 522, 88 S.Ct. at 1777. To be excluded, a potential juror must make it "unmistakably clear" that his objections to the death penalty are so strong that they would (1) prevent his voting for a sentence of death under any circumstances, or (2) interfere with his impartial evaluation of the defendant's guilt. *Id.* at 522-23 n. 21, 88 S.Ct. at 1777 n. 21. The advisory nature of the jury's role under the Florida sentencing procedure

## II. IMPROPER EXCLUSION OF A POTENTIAL JUROR

■ Stewart contends that the exclusion for cause of a potential juror (Tom Gillis) constituted a violation of *Witherspoon*. The venireman's comments [4] unambiguously show that his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. at 412, 424, 105 S.Ct. at 846, 852. The factual finding by the trial judge that this venireman could not perform his responsibility as a juror in a capital case should be given deference under *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982); *see Wainwright v. Witt,* 469 U.S. at 426–30, 105 S.Ct. at 853–55; 28 U.S.C. § 2254(d) (1982). No *Witherspoon* violation occurred in this case.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Stewart asserts that he was denied effective assistance of counsel in violation of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We reject this claim. The physical evidence available to the state in this case was overwhelming. Additionally, Stewart confessed to police. In the face of this evidence, defense counsel, at trial, argued that Stewart was innocent. Even after the jury returned a verdict of guilty, counsel used a portion of his allotted time during sentencing to argue that Stewart was innocent.

Stewart now contends that the reliance upon a claim of innocence, to the exclusion of all else, was ineffective and resulted in defense counsel's failure to investigate Stewart's background sufficiently. Stewart claims that evidence of his mental condition, background, and character would have changed the result of the sentencing

proceeding. He relies upon a psychological examination conducted four years after his conviction which concludes Stewart had been mentally ill his entire life. Stewart also claims that witnesses were available to defense counsel who could have "evoked a sympathetic response" from the jury had they been contacted by defense counsel.

Trial counsel made a strategic decision that in light of the atrocious nature of the offense, Stewart's only chance of avoiding the death penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury. This court has repeatedly recognized the impact such an argument may have upon a jury. *See Johnson v. Wainwright,* 806 F.2d 1479, 1482 (11th Cir.1986) (citing cases), *cert. denied sub nom. Johnson v. Dugger,* —— U.S. ——, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987); *Smith v. Balkcom,* 660 F.2d 573, 580–81 (5th Cir. Unit B 1981), *modified on other grounds,* 671 F.2d 858 (5th Cir. Unit B 1982), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). Every court which has ruled upon Stewart's claims has recognized that under the circumstances of this rape and murder, defense counsel had little with which to work in arguing against death. Trial counsel cannot be faulted for attempting to make the best of a bad situation.

Defense counsel presented a logical and well-constructed argument inviting the jury to believe that the defendant left the victim alive and another party, said to be a dope addict, committed the murder. This was a classic attempt to create lingering doubt in the minds of jurors as to Stewart's guilt. *See Johnson v. Wainwright,* 806 F.2d at 1482; *Smith v. Balkcom,* 660 F.2d at 580–81. Counsel was not constitutionally deficient for devoting his resources, both in terms of argument time and pre-trial investigation, to such a strategy.

complicates this inquiry, since *Caldwell* teaches that a juror may be willing to vote for an advisory verdict of death, even though he would not vote to impose a death sentence if the jury had the final word. We therefore would be surprised if a defense attorney could be prohibited from asking a death-scrupled venireperson whether he could vote to recommend a death sentence under the Florida advisory procedure, even though he would be unwilling to vote for the death penalty if the jury actually imposed the sentence.

**4.** The relevant portions of the trial transcript are set forth as an appendix hereto.

■ Even were we to find trial counsel's conduct in this regard to fall below the performance standard of *Strickland*, no prejudice has occurred. Stewart now proffers the testimony of additional character witnesses who he claims should have been called to testify at trial. We are not persuaded that these witnesses would have had any significant impact upon the trial. Such testimony would have merely been cumulative. The evidence which Stewart now claims should have been presented to the jury would not have had an effect on their verdict.

## IV. RACIALLY DISCRIMINATORY IMPOSITION OF THE DEATH PENALTY

■ Finally, Stewart claims that the death penalty is imposed in a racially discriminatory manner in the state of Florida. In light of the Supreme Court's recent decision in *McCleskey v. Kemp,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), this claim is without merit. *See Ford v. Strickland,* 734 F.2d 538, 541 n. 2 (11th Cir.1984).

For the reasons set forth herein, the judgment of the district court is

AFFIRMED.

## APPENDIX

THE COURT: Mr. Gillis, you have heard all of the questions that the attorneys have been asking and the—

MR. GILLIS: Yes, Your Honor.

THE COURT: Now seated—

MR. GILLIS: I don't believe in capital punishment at all.

THE COURT: Under any facts or circumstances?

MR. GILLIS: No, ma'am.

THE COURT: Let us take it in the two part question.

Do you feel that your feelings about capital punishment would prevent you from reaching a decision as to the guilt or innocence of the defendant in the first trial?

MR. GILLIS: No.

THE COURT: Do you feel there are no circumstances, no matter how atrocious or heinous or cruel, that could be presented or shown to you that would warrant you in recommending—and only in recommendation—to the Court that the death penalty be imposed?

MR. GILLIS: No, ma'am.

Trial Transcript at 425–26.

. . . .

MR. SHERMAN: Is it that you really understand no set of circumstances that you could impose the death penalty, or any other reason why you don't want to serve on this jury?

MR. GILLIS: I mean, in the Manson case, I would think about it hard in something like that. But, I just don't think I could.

MR. SHERMAN: But, you would consider it in the Manson case?

MR. GILLIS: Sure, I would, but I don't think that—

THE COURT: What?

MR. GILLIS: I would consider it, but I don't think that I could do it.

THE COURT: You don't think you could do it?

MR. SHERMAN: But, you are not sure? Would it be fair to say that you have to hear the facts and then maybe you could consider it? Is that a fair statement?

MR. GILLIS: Yes, sir.

MR. STELZER: Mr. Gillis, can you envision any set of circumstances in this case where you could look at that person and say that, "I recommend that he be sentenced to death in the electric chair."

Can you do that?

Mr. Gillis: If I saw gross and gorey pictures.

THE COURT: What did he say?

MR. GILLIS: If I saw a lot of gorey pictures and they turned my stomach and everything, I guess I could.

MR. STELZER: What if the law makes no mention of gorey pictures at all, and in the law it has nothing to do with gorey pictures as to whether or not you will recommend death or life imprisonment?

MR. SHERMAN: I will object to the form of the question.

THE COURT: Form is improper. Sustained.

MR. STELZER: Can you form in your own opinion whether it will relate to death penalty, and follow the law even if the law is totally different than what you think?

MR. GILLIS: I really don't think that any case deserves the death penalty except on—I stuttered when I said that.

THE COURT: What did he say?

MR. STELZER: Say what you said.

MR. GILLIS: (No response.)

THE COURT: Say what you said, I want to hear it.

MR. STELZER: Would you tell, Your Honor, the comment that you made.

MR. SHERMAN: I object, Your Honor.

MR. GILLIS: All I said was that I stuttered when I said that.

THE COURT: Oh, I see.

Will the attorneys and the court reporter please come side bar.

(Thereupon, Counsel for the respective parties and the court reporter approached the bench and the following proceedings were had:)

MR. STELZER: Challenge for cause.

MR. SHERMAN: Objection, Your Honor. All he said at the end was I don't think that the death penalty—he doesn't think that he would vote for the death penalty. He doesn't think it is deserved of anyone. Under an atrocious crime, he could consider it.

THE COURT: He finally said he wouldn't vote to impose the penalty, but he said that under the facts of Charles Manson, he could.

Over objections of Defense, Mr. Gillis is excused for cause.

*Id.* at 436–39.

1. 804 F.2d 1526 (11th Cir.1986), *modified,* 816 F.2d 1493 (11th Cir.1987), *cert. granted,* —— U.S.

KRAVITCH, Circuit Judge, dissenting:

Respectfully, I dissent. The majority has concluded that a *Caldwell* violation made during *voir dire* benefits the defendant. The majority speculates that a capital defendant profits by *Caldwell* error at *voir dire* because misleading comments about the jury's responsibility in the capital sentencing process increase the possibility that a juror opposed to the death penalty is empaneled. This conclusion is contrary to *Caldwell,* to our decision in *Adams v. Wainwright,* [1] and to the facts of this case.

In *Caldwell,* the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). The offending comments in *Caldwell* were made by the prosecutor and trial judge at closing argument, not at *voir dire.* We held in *Adams,* however, that misleading comments made during *voir dire* can violate *Caldwell.* 804 F.2d at 1531 n. 7. *Voir dire* is the court's and counsel's first opportunity to explain the case to the jury. At *voir dire* the jurors obtain their "first impression" about the capital sentencing process, and this impression undoubtedly retains an influence during the rest of the case.

The majority attempts to distinguish *Caldwell* and *Adams* by arguing that misinforming Stewart's jury about its role as a capital sentencer "was probably beneficial to the defense." At 3507. I cannot agree. Any benefit that a defendant might obtain by the empaneling of a juror opposed to the death penalty is probably neutralized by the misinformation that the juror receives about the importance of his or her task. Indeed, the majority stresses this point when it states, "A prospective juror who could not bring himself to *impose* the death penalty might nevertheless find with-

——, 108 S.Ct. 1106, 99 L.Ed.2d 267 (1988).

in himself the ability to *recommend* the death penalty." *Id.* (emphasis in original). This result is precisely why misleading comments at *voir dire* violate *Caldwell*. We observed recently in *Mann v. Dugger*, 844 F.2d 1446 (11th Cir.1988) (en banc), that juries in Florida capital cases do not merely recommend a sentence; the law of Florida requires the trial judge to give the jurors' decision great weight. Furthermore, "the Supreme Court of Florida has recognized that a jury recommendation of death has a *sui generis* impact on the trial judge, an impact so powerful as to nullify the general presumption that a trial judge is capable of putting aside error." *Mann,* 844 F.2d at 1454. If a Florida juror is influenced to "find within himself" the ability to recommend the death penalty because he labors under a state-induced misconception about the nature of his task, *Caldwell* has been violated. It is farfetched to argue that such a juror is "an ally of the defense." [2]

Even if the majority's theories about the beneficial effect of *Caldwell* violations are applicable in some trials, they were not in Stewart's case. The majority discusses at some length the empaneling of juror Thibodeau, who expressed reservations about the death penalty. Yet the prosecutor successfully challenged for cause at least eight other persons because they expressed opposition to, or reservations about, the death penalty: prospective jurors Jackson, Tr. 280, Bouquio, Tr. 287, Johnson, Tr. 290, Bross, Tr. 374, Hill, Tr. 376, Gillis, Tr. 439, Dykes, Tr. 467, and McRae, Tr. 559. The record thus refutes the majority's suggestion that Stewart received a substantial boon from the misstatements of the law at *voir dire.*

---

**2.** The majority also does not consider that *Caldwell* error can influence those jurors who do not express opposition to capital punishment during *voir dire.* A juror may have every intention of following the legislature's judgment about the propriety of capital punishment but may feel that, on the facts of a particular case, the question of whether capital punishment is warranted is very close. There is a very real danger that such a juror would be influenced to vote for death instead of life if he believes that the jury's decision is merely advisory. "Even when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to 'send a message' of extreme disapproval

Rather than dwell on the potentially beneficial effects of *Caldwell* error, I would simply conclude that misleading statements to the jury about its role in the sentencing process that are made by *defense* counsel do not violate the eighth amendment but must be raised as error under the rubric of ineffective assistance of counsel. *Caldwell* error is a particular species of prejudicial comment made by a prosecutor or a trial judge. It is *state-induced* error. *See Caldwell,* 105 S.Ct. at 1640. *Caldwell* is not implicated by a defense attorney's misleading comments about the death penalty any more than, for example, the fifth amendment is implicated by a defense attorney's comment on his client's failure to testify. *Caldwell* reflects the intuition that jurors pay special heed to comments made by the judge and prosecutor because those persons represent the authority of the state. A defense attorney does not occupy the same position, and inappropriate comments made by defense counsel implicate different constitutional concerns.

If the only misleading comments in this case had been made by the defense attorney, I would concur in the decision to affirm the district court. The majority's opinion states, however, that "[d]efense counsel ... did not object to similar comments made by the prosecutor and the trial judge." At 3507.[3] An examination of the record reveals that the prosecutor and trial judge violated *Caldwell* by misleading the jury. At *voir dire,* the trial court stated:

> In the event, if and only if there is a conviction for the crime of first degree murder, then there is a subsequent hearing or second trial as to which the jury is

---

for the defendant's acts. This desire might make the jury very receptive to [assurances] that it can more freely" err because the error will be corrected elsewhere. *Caldwell,* 105 S.Ct. at 2641.

**3.** The defense attorney's failure to object does not prevent us from reaching the merits of Stewart's *Caldwell* claim under principles of procedural bar. The *Caldwell* claim was not "reasonably available" at the time of Stewart's trial in April 1979. *See Adams v. Dugger,* 816 F.2d at 1500.

asked, that is, to say the same jury which has already determined the guilt or innocence of the defendant, *to recommend and [it] is only a recommendation,* to the Court, that is, to me, the Judge, what sentence should be imposed to the crime of first degree murder.

. . . .

In the second so called trial, a majority vote of the jurors recommends, *and again I repeat [it] is only a recommendation to this Court,* whether the sentence for the defendant should be death or life imprisonment without possibility for parole for twenty-five years.

Tr. 111.[4] Later during *voir dire,* prosecuting attorney Stelzer stated:

The State in this case is asking for the death penalty. I will make no bones about it whatsoever. We are seeking ... a recommendation, *because you don't have the right in Florida to pass sentence on anybody.*

Tr. 201;[5] *see also* Tr. 206. Still later during *voir dire,* prosecutor Godwin asked the array:

Do you understand that your recommendation which would be a recommendation of a majority of the jury, *that the Court could accept the recommendation or reject the recommendation.*

Tr. 392.[6] The judge continued to inform the jury that its verdict on the death sentence would not be binding:

The second trial, unlike the first, which must be a unanimous vote, the jurors['] vote must be only a majority as to the recommendation, *and it is only a recommendation to the Court,* whether the sentence should be death or life imprisonment without possibility for parole for twenty-five years.

Tr. 476.[7] Finally, prosecutor Stelzer told a group of prospective alternate jurors:

Do you understand that your recommendation does not have to be followed by [the judge]. It is all that twelve people out here could recommend to [the judge] that the proper sentence would be life imprisonment and she could still impose the death penalty *or vice versa.*

Tr. 565.[8]

The court repeated the *Caldwell* error several times at the sentencing hearing, when it told the jury:

Final decision as to what punishment shall be imposed *rests solely with the judge of this court, that is, upon me;* however, the law requires that you, the jury, render to the Court an advisory sentence as to what punishment should be imposed upon the defendant.

. . . .

As you have been told, the final decision as to what punishment should be imposed is a responsibility *of the trial judge;* however, it is your duty to follow the law which will now be given you by the Court and render to the Court an advisory sentence based upon the aggravating circumstances which you find to exist.

Tr. 2275–76; *see also* Tr. 2442. The prosecutor stated in his closing argument:

*The purpose is not to have you sentence anybody to anything. In all due respect to you all, you don't have that right. That is reserved to the right of one person. It is not me or Mr. Goldstein. It is Judge Lenore Nesbitt. She needs guidance, and that is what you are here for,* to tell her—after seeing the laws of Florida,—if, whether under the laws of the State of Florida after being represented to you, this is the type of case that calls for a recommendation of capital punishment.

---

**4.** Jurors Salapatas, Capote, Thibodeau, and Lindemann were present when the judge made these remarks. Tr. 112, 471.

**5.** At least one prospective juror who actually served, Salapatas, was present at this point. Tr. 201, 471.

**6.** Juror Johnson was present at this point. Tr. 392, 471.

**7.** Juror Gailey was present when the judge made these remarks. Tr. 509.

**8.** Two of the prospective alternates present, Martell and Hernandez, were chosen to serve.

*If so, your advisory sentence—and it is only advisory—because if Judge Nesbitt thinks that you are wrong, she does not have to follow it. If she thinks you are wrong in imposing a sentence of death —if you recommend a sentence of capital punishment—she can overrule you and put a punishment of life imprisonment.*

Tr. 2394–95. These excerpts convince me that the court and the prosecutor misinformed the jurors about their role in sentencing. The jurors were told that their decision was "merely" a recommendation, not at all binding on the judge. They were never told that Florida law requires the trial judge to give great weight to the jury's recommendation or even, as in *Harich v. Dugger*, 844 F.2d 1464 (11th Cir. 1988) (en banc), that the jury's sentencing verdict would be "very vital" to the outcome of the sentencing decision and would "giv[e] some direction" to the court. *See id.*, Opinion of Tjoflat, J., at 1475. Under *Caldwell* and under our decisions in *Adams, Mann,* and *Harich,* Stewart should be resentenced.