**Roy Allen STEWART, Petitioner–Appellant,**

v.

**Richard L. DUGGER, As Secretary Department of Corrections, State of Florida, Respondent–Appellee.**

No. 86–5800.

United States Court of Appeals, Eleventh Circuit.

June 27, 1989.

---

Robin H. Greene, Sp. Asst. Public Defender, Coral Gables, Fla., for petitioner-appellant.

Calvin Fox, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before RONEY, Chief Judge, and HILL and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

The court, *sua sponte*, reconsiders this case insofar as our previous opinion addressed an issue which had been raised by the court *sua sponte* and unadvisedly. For the reasons stated, one section of our previous opinion (I–B) is stricken and a statement of the reasons for its being stricken is inserted. In order that our entire opinion may be found in one place, we vacate our

earlier opinion, 847 F.2d 1486 (11th Cir. 1988), and the following is adopted in its place and stead:

Roy Allen Stewart brought this federal habeas petition challenging his sentence of death. His petition sets forth four claims for relief; (1) comments made by the trial judge diminished the role of the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), (2) improper exclusion of a juror in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), (3) ineffective assistance of counsel at sentencing, and (4) racial discrimination in imposing the death penalty. The federal district court denied relief on all four claims. We affirm.

The facts surrounding Stewart's 1979 conviction are sufficiently detailed by the Florida Circuit Court's order denying state habeas relief:

> The victim, Margaret Haizlip, a woman of small physical stature, in her late seventies, was a pioneer of South Florida living in a small home across from Stewart's temporary residence. About 10:00 p.m. Mrs. Haizlip was out on her porch and saw Stewart. She waived [sic] to him, invited him into her home and fixed him a sandwich. Shortly thereafter he went to her bathroom and stole a gold watch from the medicine cabinet. Mrs. Haizlip, after going into the bathroom confronted the defendant, apparently about the stolen watch, whereupon Stewart beat and pummelled Mrs. Haizlip unmercifully about her ribs, face and head. While so doing, the defendant was tearing the clothing and ultimately the underwear from her body. As she lay on the floor, bleeding from her face, moaning and "making noises," the defendant forcibly had sexual intercourse with her in a manner so vicious so as to tear her vagina. The defendant thereupon fastened a cord with an iron attached to it around her neck, pulled tightly on the cord and thereby strangled her leaving a ligature mark on her neck.

> The medical examiner testified the victim suffered eight broken ribs, multiple contusions, and her larynx was broken. A bite mark was identified on her thigh, and what appeared to be a bite mark was on her breast. There were blood stains and disarray in the living room and bedroom area of her house, indicating the victim was fighting and running for her life. The defendant left the victim at the scene with blood on his hands.

Sentence Order dated July 26, 1979 at 3–4.

On September 19, 1986, the governor of Florida signed a death warrant (Stewart's second). Stewart's execution was subsequently scheduled to occur on October 7, 1986. Stewart commenced various collateral attacks in state court; a previous round of state collateral attacks had proved unsuccessful. After Stewart's claims were rejected a second time by the Florida state courts, Stewart commenced this federal habeas proceeding. On October 5, Stewart's petition was denied by the United States District Court for the Southern District of Florida. The district court, however, granted a certificate of probable cause to appeal, but denied a stay of execution. In view of the fact that the district court had granted a certificate of probable cause to appeal, we granted a stay of execution. *Stewart v. Wainwright*, 802 F.2d 395 (11th Cir.1986); *see* Eleventh Circuit Rule 22–3; *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

## I. THE CALDWELL V. MISSISSIPPI ISSUES

### A

■ Stewart contends that comments made during *voir dire* diminished the role of the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). During *voir dire*, the trial court asked the following question of a juror:

> Just briefly, let me ask you about capital punishment. We have to ask this question, ... because this is one of those cases where the legislature has said that the death penalty is the appropriate penalty.

Trial Transcript at 409. Stewart claims that the impact of this statement was compounded by the judge's earlier comment to the jury that "[y]ou will assume that all the proper evidence and the proper law will be presented to you." *Id.* at 358–59. According to the appellant, the effect of the judge's comment was to instruct the jury that the appropriateness of his execution had already been decided by the state legislature, thus minimizing the jury's sense of responsibility for determining the death penalty. We disagree.

The inquiry under *Caldwell* is whether comments made at trial "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Dugger v. Adams,* —— U.S. ——, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989) (quoting *Darden v. Wainwright,* 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, n. 15, 91 L.Ed.2d 144 (1986)); *See Harich v. Dugger,* 844 F.2d 1464, 1473 (11th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989); *Mann v. Dugger,* 844 F.2d 1446, 1456 (11th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989). Here, in the context of the entire trial, it is clear that the jurors were under no impression that the legislature had predetermined the appropriateness of the death penalty for Stewart. Although the trial judge's question to the prospective juror was inartfully phrased, the trial judge intended to convey the message (1) that the legislature had determined the death penalty to be appropriate in the narrow class of homicides in which aggravating circumstances are present, (2) that the prosecutor intends to present evidence of such aggravating circumstances in this case, and (3) that the jury may impose death if aggravating circumstances outweigh mitigating circumstances. Throughout *voir dire,* the jury was informed that not all murders call for capital punishment and that a finding of guilt as to first-degree murder does not require a verdict of death. *Id.* at 275, 344, 348, 415, 419, 482, 490, 506, 566. On at least eighteen occasions the trial judge referred to the fact that death can only be imposed under appropriate circumstances. *Id.* at 298, 299, 302, 309, 397, 400, 406, 441, 458, 460, 463, 479, 480, 513, 521, 526, 527, 550; *see also id.* at 518, 535, 567–68 (comments of counsel). The jury was also specifically informed during *voir dire* that they would be required to weigh aggravating and mitigating circumstances during the sentencing phase. *Id.* at 392, 444. Furthermore, the terms aggravating and mitigating circumstances were defined during *voir dire. Id.* at 530–33. Most significantly, the jury was informed that the legislature had only enacted *guidelines* as to when the sentence of death was appropriate. *Id.* at 203, 213, 347, 348, 371, 563. Under these circumstances, the trial judge committed no *Caldwell* error.

## B

■ While reviewing the *Caldwell* claim raised by Stewart and addressed above, this court noticed other occasions where defense counsel, the prosecutor and the trial judge touched on functions of the jury which might have been asserted as implicating *Caldwell* in a manner different from that which had been suggested by Stewart. The court *sua sponte* requested supplemental briefing and then addressed the merits of some, but not all, of these other, potential *Caldwell* issues. *See Stewart v. Dugger,* 847 F.2d 1486, 1489–93. (11th Cir.1988). Upon further consideration of this record, however, we conclude that this court should not have analyzed these *Caldwell* issues. As our now withdrawn opinion observed, it was Stewart who initiated many of the comments we viewed as possibly implicating *Caldwell.* At trial, he did not object to these comments or others made by the trial judge and by prosecuting counsel. Stewart did not challenge the legality of any of these comments in his direct appeal to the Supreme Court of Florida. As a result, he waived these claims under Florida law. *See Adams,* 109 S.Ct. at 1217, n. 6 (citing numerous Florida cases).[1] There is no assertion or basis for

---

1. In fact, Stewart has never raised these claims

in the courts of Florida or in the district court.

finding that "cause" and "prejudice" would excuse this procedural default, *see Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), and it is clear that our failure to review these additional *Caldwell* issues would not result in the death sentence of "one who is actually innocent," *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986). Our review of the issues we raised on our own motion is, therefore, precluded. *See Adams*, 109 S.Ct. at 1215–1217 (defendant's failure to raise *Caldwell* claim on direct appeal to the Florida Supreme Court constituted a state procedural default which was not excused by cause and prejudice or actual innocence, thus preventing federal habeas review.).[2]

In contrast, Stewart did challenge the constitutionality of the comments discussed in part I–A of this opinion in his direct appeal to the Supreme Court of Florida. *See* Appellant's Brief to the Supreme Court of Florida, R–15 at 8; *Stewart v. State*, 420 So.2d 862, 863 (Fla.1982), *cert. denied*, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 366 (1983).[3] Stewart thereby properly preserved this claim for federal habeas review.[4]

## II. IMPROPER EXCLUSION OF A POTENTIAL JUROR

■ Stewart contends that the exclusion for cause of a potential juror (Tom Gillis) constituted a violation of *Witherspoon.* The venireman's comments[5] unambiguously show that his views would "prevent or

substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The factual finding by the trial judge that this venireman could not perform his responsibility as a juror in a capital case should be given deference under *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); *see Wainwright v. Witt*, 469 U.S. at 426–30, 105 S.Ct. at 853–55; 28 U.S.C. § 2254(d) (1982). No *Witherspoon* violation occurred in this case.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Stewart asserts that he was denied effective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We reject this claim. The physical evidence available to the state in this case was overwhelming. Additionally, Stewart confessed to police. In the face of this evidence, defense counsel, at trial, argued that Stewart was innocent. Even after the jury returned a verdict of guilty, counsel used a portion of his allotted time during sentencing to argue that Stewart was innocent.

Stewart now contends that the reliance upon a claim of innocence, to the exclusion of all else, was ineffective and resulted in defense counsel's failure to investigate Stewart's background sufficiently. Stewart claims that evidence of his mental condition, background, and character would

2. We note that the State of Florida pointed out in its supplemental brief that Stewart's procedural default precluded our consideration of these other *Caldwell* issues. Having raised these issues by our own motion perhaps led us to their resolution and caused us to overlook the procedural bar.

3. Despite appellant's failure to object to comments by the trial judge concerning the legislature and the death penalty, the Supreme Court of Florida nevertheless addressed the merits of this claim.

4. In addition, although we do not decide the merits of any additional *Caldwell* claims, we observe that, contrary to our former opinion, a defense attorney's comments which may mis-

lead the jury as to its role in the sentencing process will not implicate *Caldwell. Caldwell* refers to state-induced error. *See Caldwell*, 472 U.S. at 330, 105 S.Ct. at 2640 ("In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are *state-induced* suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.") (emphasis added). Thus, the claim that a defense lawyer misled the jury is more properly brought under the rationale of ineffective assistance of counsel rather than as a violation of the Eighth Amendment. *See Stewart v. Dugger*, 847 F.2d at 1497 (Kravitch, J., dissenting).

5. The relevant portions of the trial transcript are set forth as an appendix hereto.

have changed the result of the sentencing proceeding. He relies upon a psychological examination conducted four years after his conviction which concludes Stewart had been mentally ill his entire life. Stewart also claims that witnesses were available to defense counsel who could have "evoked a sympathetic response" from the jury had they been contacted by defense counsel.

Trial counsel made a strategic decision that in light of the atrocious nature of the offense, Stewart's only chance of avoiding the death penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury. This court has repeatedly recognized the impact such an argument may have upon a jury. *See Johnson v. Wainwright*, 806 F.2d 1479, 1482 (11th Cir.1986) (citing cases), *cert. denied sub nom. Johnson v. Dugger*, — U.S. —, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987); *Smith v. Balkcom*, 660 F.2d 573, 580–81 (5th Cir. Unit B 1981), *modified on other grounds*, 671 F.2d 858 (5th Cir. Unit B 1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). Every court which has ruled upon Stewart's claims has recognized that under the circumstances of this rape and murder, defense counsel had little with which to work in arguing against death. Trial counsel cannot be faulted for attempting to make the best of a bad situation.

Defense counsel presented a logical and well-constructed argument inviting the jury to believe that the defendant left the victim alive and another party, said to be a dope addict, committed the murder. This was a classic attempt to create lingering doubt in the minds of jurors as to Stewart's guilt. *See Johnson v. Wainwright*, 806 F.2d at 1482; *Smith v. Balkcom*, 660 F.2d at 580–81. Counsel was not constitutionally deficient for devoting his resources, both in terms of argument time and pre-trial investigation, to such a strategy.

Even were we to find trial counsel's conduct in this regard to fall below the performance standard of *Strickland*, no prejudice has occurred. Stewart now proffers the testimony of additional character witnesses who he claims should have been called to testify at trial. We are not persuaded that these witnesses would have had any significant impact upon the trial. Such testimony would have merely been cumulative. The evidence which Stewart now claims should have been presented to the jury would not have had an effect on their verdict.

## IV. RACIALLY DISCRIMINATORY IMPOSITION OF THE DEATH PENALTY

Finally, Stewart claims that the death penalty is imposed in a racially discriminatory manner in the state of Florida. In light of the Supreme Court's decision in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), this claim is without merit. *See Ford v. Strickland*, 734 F.2d 538, 541 n. 2 (11th Cir.1984).

For the reasons set forth herein, the judgment of the district court is

AFFIRMED.

## APPENDIX

THE COURT: Mr. Gillis, you have heard all of the questions that the attorneys have been asking and the—

MR. GILLIS: Yes, Your Honor.

THE COURT: Now seated—

MR. GILLIS: I don't believe in capital punishment at all.

THE COURT: Under any facts or circumstances?

MR. GILLIS: No, ma'am.

THE COURT: Let us take it in the two part question.

Do you feel that your feelings about capital punishment would prevent you from reaching a decision as to the guilt or innocence of the defendant in the first trial?

MR. GILLIS: No.

THE COURT: Do you feel there are no circumstances, no matter how atrocious or heinous or cruel, that could be presented or shown to you that would warrant you in recommending—and only in recommendation—to the Court that the death penalty be imposed?

MR. GILLIS: No, ma'am.

Trial Transcript at 425–26.

. . . .

MR. SHERMAN: Is it that you really understand no set of circumstances that you could impose the death penalty, or any other reason why you don't want to serve on this jury?

MR. GILLIS: I mean, in the Manson case, I would think about it hard in something like that. But, I just don't think I could.

MR. SHERMAN: But, you would consider it in the Manson case?

MR. GILLIS: Sure, I would, but I don't think that—

THE COURT: What?

MR. GILLIS: I would consider it, but I don't think that I could do it.

THE COURT: You don't think you could do it?

MR. SHERMAN: But, you are not sure? Would it be fair to say that you have to hear the facts and then maybe you could consider it? Is that a fair statement?

MR. GILLIS: Yes, sir.

MR. STELZER: Mr. Gillis, can you envision any set of circumstances in this case where you could look at that person and say that, "I recommend that he be sentenced to death in the electric chair."

Can you do that?

Mr. Gillis: If I saw gross and gorey pictures.

THE COURT: What did he say?

MR. GILLIS: If I saw a lot of gorey pictures and they turned my stomach and everything, I guess I could.

MR. STELZER: What if the law makes no mention of gorey pictures at all, and in the law it has nothing to do with gorey pictures as to whether or not you will recommend death or life imprisonment?

MR. SHERMAN: I will object to the form of the question.

THE COURT: Form is improper. Sustained.

MR. STELZER: Can you form in your own opinion whether it will relate to death penalty, and follow the law even if the law is totally different than what you think?

MR. GILLIS: I really don't think that any case deserves the death penalty except on—I stuttered when I said that.

THE COURT: What did he say?

MR. STELZER: Say what you said.

MR. GILLIS: (No response.)

THE COURT: Say what you said, I want to hear it.

MR. STELZER: Would you tell, Your Honor, the comment that you made.

MR. SHERMAN: I object, Your Honor.

MR. GILLIS: All I said was that I stuttered when I said that.

THE COURT: Oh, I see.

Will the attorneys and the court reporter please come side bar.

(Thereupon, Counsel for the respective parties and the court reporter approached the bench and the following proceedings were had:)

MR. STELZER: Challenge for cause.

MR. SHERMAN: Objection, Your Honor. All he said at the end was I don't think that the death penalty—he doesn't think that he would vote for the death penalty. He doesn't think it is deserved of anyone. Under an atrocious crime, he could consider it.

THE COURT: He finally said he wouldn't vote to impose the penalty, but he said that under the facts of Charles Manson, he could.

Over objections of Defense, Mr. Gillis is excused for cause.

*Id.* at 436–39.